**AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO, Plaintiff,**

v.

**John B. CONNALLY, Individually, and as Chairman of the Cost of Living Council, et al., Defendants.**

**Civ. A. No. 1833–71.**

United States District Court, District of Columbia.

Oct. 22, 1971.

Albert Gore, Chicago, Ill., with whom Jerry Anker, Washington, D. C., and Soloman I. Hirsh, Chicago, Ill., were on the papers, for plaintiffs.

David J. Anderson, Dept. of Justice, with whom L. Patrick Gray, III, then Asst. Atty. Gen., Civil Div., Thomas A. Flannery, then U. S. Atty., and Harland F. Feathers and Stuart E. Schiffer, Dept. of Justice, were on the papers, for federal defendants.

Charles A. Horsky, Washington, D. C., for defendant Swift and Co.

Robert J. Corber, Washington, D. C., for defendant Armour & Co.

Richard J. Wertheimer, Washington, D. C., for defendant Hygrade Food Products Corp.

Laurence Wood, Washington, D. C., for defendants Wilson Certified Foods, Wilson-Sinclair and Wilson Beef & Lamb Co.

Stanley R. Strauss, Washington, D. C., for defendant Cudahy Packing Co.

Before LEVENTHAL, Circuit Judge, and ROBINSON and RICHEY, District Judges.

## OPINION IN SUPPORT OF ORDER DENYING INJUNCTION

LEVENTHAL, Circuit Judge:

In this litigation Plaintiff Union, the Amalgamated Meat Cutters [1] suing on its own behalf and on behalf of its affiliated local unions, attacks the constitutionality of the Economic Stabilization Act of 1970 (Act [2]), contained in

1. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO.

2. P.L. 91–379, 84 Stat. 799; as amended, P.L. 91–558, 84 Stat. 1468; P.L. 92–8, 85 Stat. 13; P.L. 92–15, 85 Stat. 38. The Act is set forth at 12 U.S.C. § 1904, note.

Title II of Public Law 91–379, 84 Stat. 799, and appended as Annex A, and governmental actions thereunder. .

Two different actions are consolidated in the complaint. Count II seeks to require the major meat packing companies [3] to perform their obligations, under their 1970 collective bargaining agreements with the Union, to grant a general wage increase of twenty-five cents an hour effective September 6, 1971. The Union asserts this wage increase was agreed upon in April 1970 after long and difficult negotiations, that the parties carefully weighed alternative benefits and concessions before agreeing on the specific provisions, and that its inclusion was decisive in obtaining the Union's acceptance. The employers respond that the implementation of the wage increase obligation would violate Executive Order 11615, 36 F.R. 15727, promulgated by President Nixon August 15, 1971, appended as Annex B. This Executive Order, Stabilization of Prices, Rents, Wages and Salaries, establishes a 90-day price-wage freeze, a requirement that "prices, rents, wages and salaries shall be stabilized for a period of 90 days" at levels no greater than the highest rates pertaining to a substantial volume of actual transactions by the seller of commodities or services involved in a specified base period preceding August 15. The Union's position is that this defense is insufficient as a matter of law because the Act is unconstitutional and the Executive Order invalid.

The broader aspect of the controversy before us appears in Count I of the complaint, an action brought against John B. Connally, who as Secretary of the Treasury is Chairman of the Cost of Living Council, and the other officials constituting the Council. In Executive Order 11615 President Nixon established the Cost of Living Council "which shall act as an agency of the United States," specified that it shall be composed of certain designated officials as members [4] and "delegated to the Council all of the powers conferred on the President by the Economic Stabilization Act of 1970."

In Count I the Union seeks a declaratory judgment that the Act and Executive Order 11615 are illegal and unconstitutional, and also an injunction against the officials named as defendants, individually and as members of the Council, restraining and enjoining them from administering or giving any force or effect to the Executive Order and the Act. In view of the prayer for injunction a three-judge District Court was convened October 3, 1971, pursuant to 28 U.S.C. §§ 2282, 2284. We heard oral argument October 8, 1971 on the Union's motion for preliminary injunction. The court rejects the Union's contention that the Act and Executive Order are invalid on their face, for the reasons set forth below.

## A. GOVERNMENT'S CONTENTION OF ADEQUACY OF REMEDY AT LAW

The federal defendants raise a threshold claim that the Union's prayer for an injunction must be dismissed because it has an adequate remedy at law. This contention would not remove the litigation, since the Union could maintain ac-

---

3. Swift & Co., Armour & Co., Hygrade Food Products Corp., Wilson Certified Foods, Wilson-Sinclair Corp., Wilson Beef & Lamb Co., John Morrell & Co., and Cudahy Packing Co.

4. Chairman: Secretary of the Treasury, Vice Chairman: Chairman of the Council of Economic Advisers, Other members: Secretary of Agriculture, Secretary of Commerce, Secretary of Labor, Director of the Office of Management and Budget, Director of the Office of Emergency Pre-

paredness, Special Assistant to the President for Consumer Affairs. All these officials were named as defendants in this action, individually and as members of the Council, and will be referred to as the "Federal defendants."

The Order also provides: "The Chairman of the Board of Governors of the Federal Reserve System shall serve as adviser to the Council." The Federal Reserve Chairman, Dr. Arthur Burns, was not named as a defendant.

tion against the employers and challenge the constitutionality of the Act and order presented as a defense. However the jurisdiction of this three-judge district court depends on both a substantial constitutional question and equity jurisdiction of the action for injunction. We conclude we have requisite equity jurisdiction.

 While under familiar doctrine, a litigant's claim to injunctive relief requires a showing of irreparable injury and inadequacy of legal remedies, these are "practical terms." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 507, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). The mere fact that a court may ultimately decide in the exercise of its discretion, including balance of conveniences, that an injunction should not be issued—even assuming for purpose of decision that plaintiff has a valid claim on the merits—does not negative equity jurisdiction. Where the action seeks to enjoin enforcement of a Federal statute on the ground of unconstitutionality, this would not negative the jurisdiction of a statutory three-judge district court. Broadly speaking such actions to contest a statute's validity, like actions to review Federal administrative action [5], may be maintained by a proceeding for injunction or declaratory judgment or both.

 Even where a declaratory judgment is available, the three-judge district court has equity jurisdiction so long as there is a reasonable possibility that it may approve of an injunction in order to give complete protection to constitutional rights [6]. Relegating the Union to the remedies contemplated by the Government would involve a multiplicity of litigation. Multiple damage actions, or their declaratory equivalent, would be required by this Union, and possibly also by its affiliates, not only against the defendant meat packers, but also against various employers in other industries—

retail foods; fur and leather; food-processing; poultry and seafood; canning; and miscellaneous non-food industries. It is alleged that the Union and its affiliates have entered into collective bargaining agreements with employers, providing for increases scheduled to take effect during the 90-day freeze period of Executive Order 11615, affecting in excess of 150,000 employees.

 There is palpably a significant difference to these thousands of employees between the receipt of these increases at the times agreed, available to meet any obligations programmed on their receipt, and any subsequent declaration of right. We need not pursue the question whether a court might have reason to withhold injunctive relief, particularly a preliminary injunction, even though it had been convinced of the merit of the Union's substantive claims. As we have indicated we do not accept the Union's position on the merits. But for present purposes we are concerned with a threshold objection, that the lack of equity jurisdiction precludes our even giving consideration to the merits of the Union's position. That contention we cannot accept. Applying familiar principles, the Union's action, seeking to prevent hardship to its members and multiplicity of litigation, clearly comes within the court's equity jurisdiction.

## B. CLAIM OF UNCONSTITUTIONALITY OF ACT AS DELEGATION OF LEGISLATIVE POWER

 The main claim of the Union is that the Act unconstitutionally delegates legislative power to the President, in violation of the general constitutional principle of the Separation of Powers, and in contravention of Article I, Section I of the Constitution, which provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

5. K. Davis, Administrative Law 731 (1951).

6. Green v. Connally, 330 F.Supp. 1150, U.S.Dist.Ct. for Dist. of Col. (3-judge court), June 30, 1971, 28 AFTR2d 71–5164.

The Union's position is that the Act's broad authority to the President "to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages and salaries" vests "unbridled legislative power in the President," a "naked grant of authority" to determine whether they "will be controlled, and the scope, manner and timing of those controls."

The constitutional question thus put to this court is novel and fraught with difficulty, for we cannot blink the broad discretion given to the President by the Act.

The matter has been argued to us on principle and precedent. The divergences in the principles perceived by the litigants are matched by divergences in the precedents they summon. The Government cites numerous authorities but relies most heavily on Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), sustaining the grant in the Emergency Price Control Act of 1942 of broad price-fixing authority. The Union particularly invokes the 1935 decisions in Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, and Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, holding invalid provisions of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195.

We are of the view that the *Yakus* ruling and principles there applied provide the more meaningful guidance for the novel problem at hand, and that this constitutional assault cannot be sustained. We review the several interrelated considerations that lead us to this conclusion.

### 1. *Permissibility of delegation of legislative power, within limits*

■■■ We may usefully begin with the modest observation that the Consti-

tution does not forbid every delegation of "legislative" power. This was recognized explicitly at least as long ago as Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 305, 53 S.Ct. 350, 354, 77 L.Ed. 796 (1933), where Justice Cardozo stated that the tariff provision under consideration involved "in substance a delegation, though a permissible one, of the legislative process."

There may thus be added to the outworn doctrines interred in the cause of wisdom the conception developed in Field v. Clark, 143 U.S. 649, 692–693, 12 S.Ct. 495, 505, 36 L.Ed. 294 (1892), which centers the validity of a delegation by Congress to the President on whether he "was the mere agent of the lawmaking department to ascertain and declare the event upon which its expressed will was to take effect." That officials may lawfully be given far greater authority than the power to recognize a triggering condition was recognized within twenty years in the famous *Grimaud* case where a unanimous Court "admitted that it is difficult to define the line which separates legislative power to make laws, from administrative authority to make regulations." [7] There is no analytical difference, no difference in kind, between the legislative function—of prescribing rules for the future—that is exercised by the legislature or by the agency implementing the authority conferred by the legislature. The problem is one of limits.

An agency assigned to a task has its freedom of action circumscribed not only by the constitutional limitations that bind Congress but by the perimeters described by the legislature as hedgerows defining areas open to the agency. The question is the extent to which the Constitution limits a legislature that may think it proper and needful to give the

---

7. United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911). The Court upheld a law that authorized the Secretary of the Interior to make rules "to insure the objects" of the national forests, and made violation of such regulation punishable as a crime. It reversed its initial 4–4 judgment affirming a decision, United States v. Grimaud, 170 Fed. 205 (S.D.Cal.1909), which held the law invalid.

agency broad flexibility to cope with the conditions it encounters.

## 2. Governing concepts of necessary flexibility and accountability for conformance to "intelligible principle" and legislative will

■ The legislative power granted to Congress by the Constitution includes the power to avail itself of "the necessary resources of flexibility and practicality * * * to perform its function [8]." The spaciousness of the legislative authority is underscored by the following quotations from the Yakus opinion voicing the elements of the applicable principles: "The Constitution as a continuously operative charter of the government does not demand the impossible or the impracticable." Congress is free to delegate legislative authority provided it has exercised "the essentials of the legislative function"—of determining the basic legislative policy and formulating a rule of conduct—held satisfied by "the rule, with penal sanctions, that prices shall not be greater than those fixed by maximum price regulations which conform to standards and will tend to further the policy which Congress has established." The key question is not answered by noting that the authority delegated is broad, or broader than Congress might have selected if it had chosen to operate within a narrower range. The issue is whether the legislative description of the task assigned "sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will [9]."

■ The Yakus ruling of Chief Justice Stone carries forward the doctrine earlier articulated by Chief Justice Taft in Hampton that there is no forbidden delegation of legislative power "if Congress shall lay down by legislative act an intelligible principle" to which the official or agency must conform [10].

■ Concepts of control and accountability define the constitutional requirement. The principle permitting a delegation of legislative power, if there has been sufficient demarcation of the field to permit a judgment whether the agency has kept within the legislative will, establishes a principle of accountability under which compatibility with the legislative design may be ascertained not only by Congress but by the courts and the public [11]. That principle was conjoined in Yakus with a recognition that the burden is on the party who assails the legislature's choice of means for effecting its purpose, a burden that is met "[o]nly if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed [12]."

These doctrines have been applied to sustain legislation that delegated broad authority indeed in order to assure requisite flexibility to the officials or agencies designated to discharge the tasks as-

---

8. Currin v. Wallace, 306 U.S. 1, 15, 59 S.Ct. 379, 387, 83 L.Ed. 441 (1939). See also Buttfield v. Stranahan, 192 U.S. 470, 496, 24 S.Ct. 349, 355, 48 L.Ed. 525 (1904): "Congress legislated on the subject as far as was reasonably practicable." Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 1316 (1948):

It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program.

9. These quotations appear in Yakus v. United States, supra, 321 U.S. at 424 and 425, 64 S.Ct. at 667 and 668.

10. Hampton v. United States, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). The core quality of the "intelligible principle" analysis is developed in L. Jaffe; An Essay on Delegation of Legislative Power, 47 Col.L.Rev. 359, 561, at 569 (1947).

11. See the excerpt, quoted below at text to footnote 37, from Yakus v. United States, 321 U.S. at 426, 64 S.Ct. at 660.

12. Yakus v. United States, 321 U.S. at 426, 64 S.Ct. at 668.

signed by the Congress. New York Central Securities Corp. v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.Ed. 138 (1932) (permitting consolidation of carriers when "in the public interest"); FPC v. Hope Natural Gas Co., 320 U.S. 591, 600, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("just and reasonable" rates for natural gas); Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 225–226, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (licensing of radio communications "as public convenience, interest or necessity requires"); Lichter v. United States, 334 U.S. 742, 785–786, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (recovery of "excessive profits" earned on war contracts). But perhaps the broadest delegation yet sustained and the one closest to the case before us came in *Yakus*, for the ultimate standard in the 1942 statute was only that the maximum prices be "generally fair and equitable."

3. *Standards of Act are sufficient, in context of history, to permit court to ascertain that 90-day "freeze" was in conformance to legislative will*

Under these governing concepts we cannot say that in the Act before us there is such an absence of standards that it would be impossible to ascertain whether the will of Congress has been obeyed.

In some respects, indeed, Congress has been precise in its limitations. The President is given an authority to stabilize prices and wages by § 202(a) of the Act, but not at levels less than those prevailing on May 25, 1970.

Moreover the legislation is not as vulnerable as it would have been prior to the amendment adopted earlier in 1971, under which the President is precluded by § 202(b) from singling out "a particular industry or sector of the economy upon which to impose controls" unless he makes a specific finding that wages or prices in that industry or sector have increased at a rate disproportionate to the rate for the economy as a whole. This limitation was added in reaction to the President's limited exercise of power to impose controls on union-negotiated wages in the building and construction industry. Legislative guidance is amplified in the pertinent committee report:

> The Committee has serious reservations about applying the price and wage control authority to a single industry. An industry subject to price controls has no control over the price it must pay for the products of other industries. Likewise, workers subject to wage controls have no protection against a continued rise in the cost of living. For these reasons, the committee hopes the administration will adopt a voluntary system of wage-price guideposts before applying mandatory controls to any specific sector of the economy.[13]

The limitation on the President's power to take action in particular industries or sectors made this authority more narrow than the authority over prices in the 1942 legislation[14]. It also clarified the will of Congress. Congress gave the President broad authority to stabilize prices, rents, wages and salaries, but in effect it contemplated that controls to achieve broad stabilization would begin with a regulation applicable to the entire economy. While the subject matter was broad, the technique was relatively confined. Confronted with the continuing and escalating inflation, Congress made its will relatively plain, by giving the President authority to halt the inflationary escalation with the issuance of

13. Sen.Rep.No.92–89, 92nd Cong. 1st Sess., p. 3, U.S.Code Cong. & Admin.News 1971, pp. 661, 662.

14. That Act as passed January 30, 1942, 56 Stat. 23, permitted the administrator to set maximum prices in a particular industry where prices, in his judgment, "have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act." The administrator issued maximum price regulations for particular industries until the General Maximum Price Regulation, issued April 30, 1942, 7 F.R. 3153, forbade the sale of most commodities at prices in excess of the highest price charged by the seller during March 1942.

a regulation providing across-the-board controls. The House Banking and Currency Committee Report specifically envisaged a 3-month "freeze" to get "a handle on inflation." H.R.Rep. No. 91–1330, p. 9 (Annex C).

This ascertainment of the contours of the power to "stabilize" is fortified by explicit legislative history. But even the text of the law, the starting point of analysis, must not be taken in a vacuum. In rejecting claims of invalid delegation of legislative power the Court has made clear that the standards of a statute are not to be tested in isolation [15] and derive "meaningful content from the purpose of the Act, its factual background, and the statutory context [16]."

The historical context of the 1970 law is emphasized in the Government's submission [17]:

"In enacting the legislation in question here, Congress was, of course, acting against a background of wage and price controls in two wars. The administrative practice under both of those Acts was the subject of extensive judicial interpretation and review. This substantial background of prior law and practice provides a further framework for assessing whether the Executive has stayed within the bounds authorized by Congress and provides more than adequate standards for the exercise of the authority granted by the Act."

We think this contention is sound. The context of the 1970 stabilization law includes the stabilization statutes passed in 1942, and the stabilization provisions in Title IV of the Defense Production Act of 1950 [18], and the "common lore" of anti-inflationary controls established by the agency approaches and court decisions, including the probing analyses of the Emergency Court of Appeals. We do not suggest that the 1970 law was intended as or constitutes a duplicate of the earlier laws. But those laws and their implementation do provide a validating context as against the charge that the later statute stands without any indication to the agencies and officials of legislative contours and contemplation.

The approaches and decisions under the earlier laws are certainly not "frozen" as guidelines for the present law. Indeed an ordinary agency is not precluded from modifying its policies, see Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1971). An agency "may switch rather than fight the lessons of experience." New Castle County Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), cert. denied, 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967).

The present administration is entitled to a fresh approach. City of

15. Intermountain Rate Cases, 234 U.S. 476, 487–88, 34 S.Ct. 986, 58 L.Ed. 1408 (1914).

16. American Power & Light Co. v. SEC, 329 U.S. 90, 104, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946); Fahey v. Mallonee, 332 U.S. 245, 250–252, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948).

17. Federal Defendants' Points and Authorities in Opposition to Plaintiff's Motion for a Preliminary Injunction, Sept. 21, 1971, p. 20.

18. See Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954), involving the wage stabilization program under the 1950 Act. The Court held the 1950 Act is to be read with reference to the Stabilization Act of 1942, as "the context in which Congress enacted it." 347 U.S. at 541, 74 S.Ct. at 749.

The Defense Production Act of 1950, Sept. 8, 1950, c. 932, 64 Stat. 798, contained Title IV—Price and Wage Stabilization. Section 402(b) specified as a prerequisite to imposition of ceilings on an individual material or service, but provided that when ceilings have been established on "a substantial part of all sales at retail and materially affecting the cost of living, the President (i) shall impose ceilings on prices and services generally, and (ii) shall stabilize wages, salaries, and other compensation generally."

Chicago v. FPC, 128 U.S.App.D.C. 107, 115–116, 385 F.2d 629, 637–638 (1967). The fact that there are significant differences between the inflationary problems of 1970 and the inflationary problems of 1942 and 1950 provides additional reasons for differences in policies. Notwithstanding the permissible differences from prior approaches the historic context of government stablization measures provides a starting point, within the broad contemplation of Congress, that negatives a conclusion that the whole program was set adrift without any rudder.

An undeniably prominent feature of the earlier stabilization programs was the adoption thereunder of across-the-board wage and price controls, typically with "freeze" and "hold-the-line" approaches, subject to relaxation for hardships and inequities under implementing standards. There can be no doubt that in its broad outlines the general freeze ordered by the President conforms to the legislative intention. Even a rudimentary recourse to available legal materials readily permits a court to ascertain at least to this extent the contours of the legislative will and the conformance of the Executive action to it.

4. *Availability of legislative stabilization purpose from legislative history*

■ The Union challenges the thesis that the 1970 Act can be sustained by reference to the earlier stabilization laws and rulings thereunder, complaining that unlike the earlier statutes the present law is "shorthand legislation," devoid of any statement of policy or objectives, or of conditions under which action is to be taken, or findings of Congressional intent.

The Act is obviously different in its structure from the law upheld in *Yakus*, which was replete with just such statements of policy, objectives and findings. The difference is largely one of drafting style, ascribable perhaps to the circumstance that the 1942 law was proposed by the Executive, and introduced on that basis after scrutiny by the legislature's drafting staffs. This circumstance is not immaterial—for power may come on occasion to be granted more broadly to one who seeks it not—but it can hardly be decisive.

The *Yakus* opinion made reference to these purposes of the 1942 law, 321 U.S. at 420, 64 S.Ct. at 665:

> to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; * * * to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, * * * and to the Federal, State, and local governments, which would result from abnormal increases in prices * * *.

While there are differences in circumstances and emphasis, the purposes relied on in *Yakus* are largely overlapping of the purposes inherent in the 1970 authority to "stabilize" prices and wages—in particular the dominant purpose of avoiding the impairment of the standard of living of consumers, wage earners and those on fixed incomes. It is not without significance that Title II of the Act of August 15, 1970, which is identified in its short title as the Economic Stabilization Act of 1970, is captioned: "Title II—*Cost of Living Stabilization.*" The situation may be diagrammed as two intersecting circles with a large overlapping sector in common.

■ The purposes of the 1970 law, to a considerable extent inherent in the very authority to "stabilize," are set forth more explicitly in the Report of the House Committee on Banking and Currency which inserted these provisions into the legislative process. H.R.Rep.

No. 91–1330 [19] (hereafter cited as House Report). We consider this Report as of such importance for the present ruling, that we append the pertinent excerpts as Annex C. Settled precedent establishes beyond any doubt that committee reports may be considered in order to ascertain the purpose of legislation [20].

The House Report states (at p. 10) that the provisions were proposed so that "the President will have all of the necessary weapons needed to control inflation." And the Committee added:

> No one can doubt that inflation is still on a rampage in our economy. The cost-of-living figures released on July 22 indicated that prices have risen in the first half of this year at a 6 percent annual rate. Granted that this rate of increase is insignificantly less than that experienced in the first half of last year, this is in no way provides any solace to the unemployed, the aged, and others living on fixed incomes, and the wage earner who finds his wages continually eroded by increases in the cost of living. This same inflation is responsible for the housing depression, the balance-of-payments crisis and the current liquidity squeeze.

Whether legislative purposes are to be obtained from committee reports, or are set forth in a separate section of the text of the law, is largely a matter of drafting style. Plainly the 1970 legislative purpose set forth in the House Report does not differ in material degree from the statement of legislative purpose in the 1942 legislation upheld in *Yakus*. This purpose was reiterated in debate on the 1970 Act.

5. *Delegation to President of "timing" of direct controls supported by legislative conclusions that indirect controls were insufficient medicine for "cost-push" inflation and that "stand-by" authority was necessary to permit the President to change his program and to use a freeze as a check on inflationary psychology*

 We see no merit in the contention that the Act is constitutionally defective because the timing of the imposition of controls was delegated to the President.

The House Report clarifies that this delegation was not an abdication by Congress, but the product of a reasoned analysis that only such delegation as to timing would further the legislative purpose of stabilization. It states that the Act "reflects a sincere congressional willingness to do its part—and to share the consequences—in a meaningful attack on its inflation," and that the stabilizing authority, together with the December 1969 law granting authority over credit for the purpose of preventing or controlling inflation [21],

> will, in the opinion of your committee, provide the President with all of the tools necessary to control inflation, while at the same time providing for healthy economic growth. In this way we will not need to rely exclusively on fiscal and monetary actions which place an inordinate burden on those segments of our economy and society least able to bear them.

Congress was acting in a setting where all were agreed on the need to control inflation but opinion was sharply divided on the optimum measures for the Government to use. As of 1970, the Presi-

---

19. This report accompanied H.R. 17880, which was passed by the House. Then the provisions in Title II, Cost-of-Living Stabilization, were added by the House to S. 3302, and were accepted by the Conference Committee, the House and the Senate.

20. United States v. International Union, UAW-CIO, 352 U.S. 567, 585, 77 S.Ct.

529, 1 L.Ed.2d 563 (1957); Cole v. Young, 351 U.S. 536, 548, 76 S.Ct. 861, 100 L.Ed. 1396 (1956); Pan American World Airways v. CAB, 380 F.2d 770, 779 (2d Cir. 1967); Pridemark, Inc. v. Commissioner, 345 F.2d 35, 41 (4th Cir. 1965).

21. P.L. 91–151, 12 U.S.C. § 1904.

dent was heeding the counsel of that substantial body of thought which advocated concentration on fiscal and monetary measures, the so-called indirect controls. Others were advocating an "incomes policy," with readiness to resort to direct controls, on the ground that wage-cost-price increases were so embedded in the structure of private decision-making that fiscal and monetary programs alone could not be successful in checking inflation without consequences of unemployment and recession that could not be tolerated.

The issue whether the delegation before us is excessive must be considered in the light of the unique situation, with the President not in accord with the conclusion of Congress as to the need or desirability of the power entrusted to him [22]. Thus the Speaker, supporting the law, put it that the President and his advisers "are prescribing the wrong medicine for the particular inflationary virus now affecting the Nation [23]," that restrictive fiscal and monetary policies are appropriate for combating traditional "demand-pull inflation" but the country was now beset by "cost-push infla-

tion" for which direct controls were needed. It is not our place to review the merits of these differences. But the physician-virus metaphor is revealing. Viewing the President as a physician in charge, Congress could advise but not mandate his diagnosis. It sought in the national interest to have the right remedy available on a standby basis, if the President should wish to adopt that prescription, following his further reflection and taking into account future developments and experience.

We cannot say that this delegation was unreasoned, or a mere abdication to the President to do whatever he willed. It conferred an authority that Congress concluded, with reasons, had a substantial likelihood of being required.

Undergirding the need for delegation on timing was the Congressional acceptance of the recommendation of many economists, labor leaders, the AFL-CIO, mayors of large cities and others, who "called on the Congress to provide discretionary standby authority to the President to impose wage, price, rent, and salary controls to combat and break the back of inflation and the inflationary

22. See Mr. Widnall, 116 Cong.Rec. H 7507, July 31, 1970, opposing the bill, quoting from President Nixon's speech to the Nation on June 17, 1970, on the economy "I will not take this Nation down the road of wage and price controls."

23. Speaker Albert's statement is at 116 Cong.Rec. p. H7508, July 31, 1970:

Last year, for the first time in a decade, the gross national product failed to grow. Industry is operating substantially below capacity. Consumer confidence has experienced a sharp deterioration. Mr. Chairman, this Nation is now in the grips of a serious recession.

Mr. Chairman, the guilty culprit is undoubtedly the traditional monetary and fiscal policies being employed by this administration in its futile and misguided efforts to combat inflation. The ill-advised medicine of a choking tight money policy has produced record high interest rates. The administration's fiscal objectives have been characterized by all the social breadth of a book-

keeper and the human compassion of an Ebenezer Scrooge. All efforts by this Congress to increase public investment in housing, health, education, and antipollution, are denounced from the White House and stoutly resisted by its spokesmen in the Congress as fiscal irresponsibility. Vetoes and threats of vetoes of our efforts to improve the quality of life in this Nation are the order of the day.

Mr. Chairman, it is abundantly clear that President Nixon and his economic advisers are prescribing the wrong medicine for the particular inflationary virus now affecting the Nation. Classical restrictive fiscal and monetary policies certainly have a proper role to play in combating traditional "demand-pull" inflation. Such demand-pull inflation is invariably the result of shortages in manpower and productive capacity. We possess neither today. Unemployment has risen during the past year and it is conceded by the administration spokesmen that it will increase further during 1970. We likewise possess an abundance of unused industrial capacity.

psychology which pervades our thinking and our economy." House Report, p. 9.

The problem of "inflationary psychology" to which the Committee referred supports the Congressional delegation on timing to the President. The success and reasonableness of government programs depends in crucial degree on their psychological ingredient. It was the contemplation of Congress that a pervasive and likely dramatic general control measure would be a convincing earnest of the breadth and depth of the commitment of the Government, and provide impetus to the Government's call to the people to endure the disappointments and grievances that are inevitable with . controls of such magnitude. Congress was not required to put such constraints on the timing of the exercise of power as to jeopardize the underlying objectives.

Finally the House Report takes cognizance, in support of delegation of "timing" to the President, that Congress might not be in session when action was requisite.[24]

■■■■ The constitutional doctrine prohibiting undue delegation of legislative power takes account of the practicalities and necessities of the public interest. The decisions permitting delegation, reviewed in part in our earlier discussion, relate to a number and variety of concrete instances. Their meaningful message requires them to be taken broadly. The national Government has the power to do what is needful for the great national purposes that identify this country's adjustments to change and ultimately survival.[25] The legislature may delegate powers that cannot meaningfully be retained or constrained. Turning to present context, the Constitution did not forbid a Congress concerned with controlling inflation from coping with escalating expectations by calling on the shock of a general Presidential freeze to check the inflationary psychology.

*6. Validity of delegation and of freeze not negatived by failure to require declaration of emergency, or by lack of sudden or sharp price movement in 1971*

Consideration of delegation of timing leads us into offshoot questions and corollary propositions.

■■■ a. The Union puts it that the delegation was excessively broad because there was no requirement that the President declare some kind of emergency before invoking these powers. The same point was made in debate by Congressmen opposed to the bill.[26] While the point is not without materiality it is not decisive. On the matter at issue, imposition of general controls, emergency is instinct in the situation. Congress may reasonably have feared that the Nation would have fared worse if the inflationary problem were dramatized by some further formal declaration of emergency, especially in view of the ambiguous situation where this kind of domestic emergency might coexist with a lessening of international stresses and strains. Since 1950 the Nation has been under a formal declaration of emergency which was initially accompanied by stabilization controls.[27] The conditions of crisis

---

24. While the point is explicitly made in the context that Congress might not be in session when controls should be terminated (House Report p. 11), there is obvious application to justify a delegation of timing of institution of controls.

25. *Cf.* 116 Cong.Rec. H. 7504, July 31, 1970, Mr. Patman, in charge of the bill: "As the Chairman of the Committee on Rules said, our country can be destroyed by inflation."

26. *E. g.*, Mr. Gross, 116 Cong.Rec. H. 7504, July 31, 1970:

"I have read through title II backward and forward and I can find no place, no point in title II of this bill where there is even the requirement on the President that he declare any kind of emergency, either war emergency or domestic emergency, as a preliminary to the invocation of these powers that here would be granted to him."

27. Proclamation No. 2914, 15 F.R. 9029 (Dec. 19, 1950).

have witnessed many an ebb and flow since 1950, and significant changes in characteristics. But the courts cannot inject a constitutional requirement of a declaration calibrating the scale of emergency warranting particular actions. Congress may also have been fearful lest a refined declaration of emergency for one purpose have unintended and undesired carryover to quite different and unvisualized areas.

b. The Union goes on to say that there was no emergency in fact, that the President himself, in his message of August 15, points out that the rate of inflation had declined from 6% to 4% per annum. It may be that the President concluded that the kind of fiscal and monetary controls that had permitted a reduction in the rate of inflation entailed consequences that would become so grievous, if relied on exclusively in the future, as to jeopardize the public interest. It may be that he concluded that fiscal and monetary controls alone could not arrive at the kind of reduction in rate of inflation, to a level under 4% or even 3%, that was necessary to offset the inflationary psychology that plagued the Nation. These are not matters for us to determine. It suffices that there are such possibilities, and that this court cannot say that the President's message either negatived any possible rational basis for his order, or offset the presumption of validity to which that order is entitled.

c. The need felt by Congress to delegate broadly to the President is not undercut by the circumstance that the country was not experiencing and Congress did not contemplate a sudden or dramatic price rise, such as sometimes accompanies a war or shooting emergency, but only a "creeping" inflation. Continuing the medical analogy a cost-push inflation is no less malignant than a demand-pull inflation. On the issue of delegation, Congress had reason to authorize the President to begin prompt treatment with direct controls whenever he concluded this was the proper course and regardless of the prior rate of spread of the disease. The matter was reconsidered in debate on the occasion of the 1971 extension, when some legislators argued that Congress should abandon a "Gulf of Tonkin" approach to the problem that delegated broadly to the President. Other legislators reasoned in response that the "creeping" nature of inflation required a broad delegation to the President to precipitate an effective counter-action.[28] We have no basis or

28. Senator Packwood proposed an amendment whereby the authority of the President to impose general controls be dependent on a concurrent resolution of Congress that this was required by the public interest. 117 Cong.Rec. p. S 6135, May 3, 1971. He argued in debate, *inter alia* (p. S 6136): "Inflation is not an emergency, if by an emergency we mean some unexpected happening occurring immediately." Senator Proxmire responded (p. S 6136):

Although I oppose the amendment, I think there is much to be said for a reluctance to give the President the kind of authority which would give him power to impose wage and price controls.

I recall that when Mr. Burns appeared before the Joint Economic Committee, he said he would give the President this authority for 2 weeks. The administration is asking for the authority for 2 years, and I have been so concerned about it that that is one of the reasons why I have limited the present authority to 6 months.

If we provide that before wage and price controls can be imposed, it is necessary to introduce a resolution to do so to have it referred to committee, to have hearings on it, to discuss it in the hearings, then to bring it out on the floor and debate on the floor that kind of resolution, we can imagine the effect that this could have on the country.

After all, if one is a businessman or the head of a labor union and anticipates that Congress is about to impose wage and price controls, there is every reason why one might proceed to try to push up his price or wages as rapidly as possible. It can be argued that this can be made retroactive. That creates great disruption in the country. It is difficult for business and labor unions to know what the future may bring.

\* \* \* \* \*

warrant for holding that what purported to be a reasoned assignment of authority was only an abdication of responsibility.

### 7. Significance of international factors

■ This is a suitable juncture to refer to the undoubted and substantial significance of the interrelation between the domestic wage and price controls and the actions taken by the President on August 15, 1971, in the field of international trade and monetary adjustments. The President's message identifies the existence of such an interrelation though not its exact nature. The House Report's recount of legislative policy includes its recital that the current inflation malady is significantly responsible for the balance-of-payments crisis and liquidity squeeze. This was a 1970 problem and a legislative objective not known at the time of the 1942 and 1950 legislation. The consequence for international trade, liquidity and monetary relationships, enhances the range of power Congress may permissibly delegate to the President. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). And it particularly substantiates the legitimacy of delegating to the President the authority as to the timing for the blending of actions with international consequences.

### 8. Limited duration of statute

■ It is also material, though not dispositive, to note the limited time frame established by Congress for the stabilization authority delegated to the President.[29] The Act as enacted on August 15, 1970 expired February 28, 1971, establishing a lifespan of about six months. Two subsequent extensions provided even shorter durations.[30] When the current expiration date of April 30, 1972, was set on May 18, 1971, Congress rejected the administration request for a two-year extension. Thus, in the words of the Government's memorandum, Congress established a "close control." It conjoined flexibility in the President to act promptly with an obligation in Congress to undertake an affirmative review without prolonged delay, without the option of acquiescence by inaction.

### 9. Statute not subject to attack as delegating authority to be unfair and inequitable; law contains standard of broad fairness and avoidance of gross inequity

■ However Congress cannot delegate unlimited authority to the Executive over prices and wages even for a period limited to say, the 8–9 months between the President's Order of August 15, 1971, and the April 30, 1972 expiration date.

The Union says that during this period the President has been given a "blank check" for internal affairs which is intolerable in our constitutional system. The Union notes that the order exempted from controls the prices charged for raw agricultural products without statutory

Because of the very nature of inflation—it creeps up and drops back and goes up—I think it is important that the decision be made very swiftly and be made by the President of the United States on the basis of the best advice he can get and not on the basis of a long, extended debate in Congress.

29. *Cf.* Nielsen v. Sec'y of the Treasury, 137 U.S.App.D.C. 345, 355, 424 F.2d 833, 843 (1970). The Court has referred to the extensions of duration of stabilization measures as signifying awareness by Congress of at least major administrative developments, *see* Allen v. Grand Cent. Aircraft Co., *supra*, 347 U.S. at 542, 544–545, 549, 74 S.Ct. 745. The delegation to a board of compulsory arbitration power over a major railway labor dispute was limited to a two-year period, though this feature was not referred to in the decision upholding constitutionality. Brotherhood of Loco. Fire & Eng. v. Chicago, B. & Q. R. Co., 225 F.Supp. 11 (D.D.C.), aff'd, 118 U.S.App.D.C. 100, 331 F.2d 1020, cert. denied, 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964).

30. An amendment passed Dec. 17, 1970, set an expiration date of March 31, 1971,—a lifespan of three and one-half months. A last-minute amendment on March 31, 1971, granted an additional two months standby authority, to expire on May 31, 1971.

authority for the exemption. It claims that the failure of Congress to require, as in the 1942 and 1950 legislation that ongoing regulations be "fair and equitable" is tantamount to a delegation to the President of the power to be unfair and inequitable. The Union complains that there was a failure to provide a system for testing these orders, administratively and by judicial review, as in the earlier legislation.

The net result, charges the Union, is a legislative initiation of control by bare executive fiat, with completely unlimited authority put at the disposal of the President.

This is a formidable fusillade, devastating verbally and not without force analytically. When the smoke clears away, however, we conclude that the Rule of Law has been beleaguered but not breached.

We begin with the observation that we cannot stand on the analysis put to us by the Government. The Government does say, correctly, that the doors of the courts remain open. But the question is, whether the courts can appraise the claim that the stabilization actions do not conform to the legislative will, measured by an intelligible standard If the courts are open only nominally, they would enhance rather than inhibit executive absolutism.

In the last analysis Government counsel seem to meet these contentions by relying on, and reiterating, the limited duration of the President's powers. That is material, as we have noted, but it is not itself a sufficient answer to the Union's contentions.

■ If the Act gives the President authority to be unfair and inequitable, as the Union claims, this legislative vessel may indeed founder on a constitutional rock.[31] But we do not reach this constitutional issue because we do not think the Act can be given the extremist interpretation offered by the Union.

■ We take this view not only because of the doctrine that statutes are to be construed so as to avoid serious constitutional questions,[32] but more directly

---

31. See e. g., Yick Wo v. Hopkins, 118 U.S. 356, at 366–370, 6 S.Ct. 1064, at 1069–1071, 30 L.Ed. 220 (1886) :

"They [the ordinance regulating laundries] seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons ; so that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of *mandamus* to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility. The power given to them is not confided to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint. * * *

"When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. * * * [T]he very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

32. For the general doctrine see e. g., United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953) and cases cited.

There is abundant precedent for application of this doctrine to avoid a conclusion that a statute vests unfettered discretion in the Executive.

because we do not think it can sensibly or fairly be said that this extremist approach was what was intended by the legislature. As we have already shown there is no lack of specificity in the constitutional sense in the standards of the Act for the initiation of controls, either in particular industries or sectors the economy, or in the general wage price freeze.

The problem that now concerns us is whether the Act has sufficient specificity to avoid the constitutional condemnation, of excessive "blank check" authority to the President, as to the period following the initial general price-wage freeze. The legislative history records the hope of the House Committee that an initial freeze for two or three months would suffice to give a handle to control inflation, and could be followed by a termination of controls.[33] But the law as extended in 1971 permitted controls for a period of some 11 months. While the Act contemplated the issuance of a general freeze it did not mandate that controls once begun as a general freeze must endure in the same vein. The House Report noted that they might be removed "in part." Members of the committee contemplated possible exceptions as well as "equity provisions."[34] This country's experience with its prior stabilization programs fairly establishes as the contemplation of Congress that controls under the Act need not be continued in a perpetuation of the general freeze beyond a temporary opening period. A

In the Japanese Immigrant Case, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721, (1903) Justice Harlan said (p. 101, 23 S.Ct. p. 615) :

> The words here used do not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power implied in the contention of the appellant.

In Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Court said at 128–130, 78 S.Ct. at 1119–1120 :

> "We, therefore, hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose. * * * We would be faced with important constitutional questions were we to hold that Congress * * * had given the Secretary authority to withhold passports to citizens because of their beliefs or associations. Congress has made no such provision in explicit terms ; and absent one, the Secretary may not employ that standard to restrict the citizens' right of free movement."

Only last year the Court said in Gutknecht v. United States, 396 U.S. 295, 306–307, 90 S.Ct. 506, 511, 24 L.Ed.2d 532 (1970) :

> The power under the [Selective Service] regulations to declare a registrant "delinquent" has no statutory standard or even guidelines. The power is exercised entirely at the discretion of the local board. It is a broad, roving authority, a type of administrative absolutism not congenial to our law-making traditions. * * * We search the Act in vain for any clues that Congress desired the Act to have punitive sanctions apart from the criminal prosecutions specifically authorized. Nor do we read it as granting personal privileges that may be forfeited for transgressions that affront the local board. If federal or state laws are violated by registrants, they can be prosecuted. If induction is to be substituted for these prosecutions, a vast rewriting of the Act is needed. Standards would be needed by which the legality of a declaration of "delinquency" could be judged.

33. See e. g., House Report at p. 9 "It is envisaged that the freeze, to be effective in getting a handle on inflation, would need to be enforced for only 2 or 3 months." See also p. 11 "[O]ne could easily envision the possibility that, once having imposed wage-price-salary-rent freezes, a few months hence it would be necessary to remove them in whole or in part." See also Congressman Reuss, 116 Cong.Rec. H. 7512, July 31, 1970, referring to the 2–3 month freeze as the time within which the administration could "work out with labor and management a noninflationary incomes policy to hold the line over the next difficult year or two."

34. Mr. Reuss, 116 Cong.Rec. H. 7512 (July 31, 1970).

freeze is always arbitrary to some extent, and while such arbitrariness can be sustained for a relatively short-range initial period its prolongation in a country as vast as ours, with problems so various, runs the risk of betraying the concept of responsible government.

We do not think it can be said that the possibility of controls beyond the initial freeze was left without any standard other than the President's unfettered discretion, including the discretion to be unfair and inequitable. This is not a case where Congress indicated an intention to leave the matter wholly to the discretion of the President without any possibility of judicial review. The ultimate standard for follow-on controls replacing the freeze is a standard of fairness and equity. This standard of removal of "gross inequities" is voiced as

an authority of the President in § 202 of the Act. *See* also House Report (p. 9). We think there is fairly implicit in the Act the duty to take whatever action is required in the interest of broad fairness and avoidance of gross inequity, although presumably his range of discretion means there may be inequities that a President may remove that he is not compelled by law to remove.

This conclusion is supported by constitutional considerations and historic context. The 1942 statute on prices specifically articulated the "generally fair and equitable" standard. But the broad equity standard is inherent in a stabilization program. It was incorporated into the 1942 wage control measures providing for stabilization of wages and salaries.[35] Fairness and equity are also furthered by the requirement (see

35. On April 27, 1942, President Roosevelt asked Congress and the Nation to carry out a 7-point stabilization program as "our present national economic policy." *See* H.Doc. 716, 77th Congress 2d Sess., 88 Cong.Rec. 3689. Point 3 stated: "To keep the cost of living from spiraling upward, we must stabilize the remuneration received by individuals for their work." He stated that legislation was not required under then prevailing circumstances, noting that labor had voluntarily given up the right to strike during the war and that existing contracts would be carried out to expiration date. In amplificátion of point 3, the President stated:

I believe that stabilizing the cost of living will mean that wages in general can and should be kept at existing scales. * * * [A]ll stabilization or adjustment of wages will be settled by the War Labor Board machinery which has been generally accepted by industry and labor for the settlement of all disputes. * * * The existing machinery for labor disputes will, of course, continue to give due consideration to inequalities and the elimination of substandards of living.

On July 16, 1942 the National War Labor Board issued its decision in the Little Steel Case. In Re Bethlehem Steel Corp. et al., No. 2748-D et al. (1 WLR 325). The Board applied the yardstick of a "stabilization factor" limiting the available wage increases to 15% above the January 1, 1941, level, the increase in the cost of living index between that date

and the President's 7-point program. The Union had requested a $1 per day increase above the wages set in April 1941 to compensate for the 13% rise in the cost of living index since April 1941. The yardstick of January 1, 1941 meant that in view of the increase established in April 1941 (of about 11%) there could only be an additional 2.8% increase not the 13% sought by the Union.

The Board granted an additional slight adjustment because of the "peculiar * * * time equities of the steelworkers," the majority opinion, written by Dr. George W. Taylor, Vice-Chairman, saying: "A mechanical and a rigid application of the stabilization program to this long-pending case" would lead to "a deep sense of injustice" in the steelworkers, arising out of the change in rules, and would indicate an arbitrariness that would "offend the American people's sense of fair play."

Chairman Davis summarized the majority opinion as applying yardsticks to wage stabilization that were *"fair and equitable"* and at the same time sufficient to prevent the cost of living from spiraling upward because of wage adjustments. We think they lead to a 'terminal' for the tragic race between wages and prices." (Emphasis added.) The Little Steel "formula" was later adopted by the Board when Congress passed the Stabilization Act of October 2, 1942. A succinct account of the foregoing appears in H. Stein, Public Administration and Policy Development 784 ff. (1952).

point 10) that the Executive develop implementing standards, with deliberate criteria replacing the fortuities of a freeze.

■ To obviate any possible misunderstanding we refer to the general principle under which the requirement of fairness takes on content in the light of what is feasible. The law does not contemplate what is manifestly impracticable, or suppose that all problems are to be taken care of at once. And so it has been held that broad emergency price control measures need not entitle each particular seller to consideration of the equity of his position, for such an obligation would impose an administrative impracticability that would defeat the very purpose of the Act. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

■ In other contexts when agencies have been given enormous regulatory tasks, the courts have interpreted the underlying statutes to take account of what is feasible. Perhaps the outstanding opinion along these lines is Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), where the Court upheld agency action exercising an authority to provide a moratorium on requests for relief (pp. 777–781, 88 S.Ct. 1344), granting exemptions not specifically voiced in the statute (pp. 785–787, 88 S.Ct. 1344), deferring certain issues and guidelines for later consideration (p. 788, 88 S.Ct. 1344), focusing first on aggregate problems and moving on in the light of experience to more refined consideration of problems of need or equity (pp. 772, 822, 88 S.Ct. p. 1344). Similarly in Wisconsin v. Federal Power Commission, 373 U.S. 294, 313–314, 83 S.Ct. 1266, 1277, 10 L.Ed.2d 357 (1963), the Court took pains to point out that ordinarily, at least, a court cannot

say that an agency makes an error of law "in deciding how best to allocate its resources" and that the courts will not deprive the agencies of "the flexibility [they] must have at this still formative period in a difficult area of * * * regulation."

It is not our purpose or function at this time to define the contours of the standard of broad fairness and avoidance of gross inequity. That would be appropriate if the taking or omission of specific action were challenged. But we reiterate that we cannot accept the contention of the Government that the court must pass on the constitutionality of the Act without any conception of its content. We take the intermediate course and rule that our judgment has two parts: first, that the statute does at least contain a standard of broad fairness and avoiding gross inequity,—leaving to the future the implementation of that standard; second, that this statute is not unconstitutional as an excessive delegation of power by the legislature to the executive for the limited term of months contemplated by Congress to follow the initiating general freeze.

10. *Need for ongoing administrative standards as avoiding undue breadth of executive authority*

■ Another feature that blunts the "blank check" rhetoric is the requirement that any action taken by the Executive under the law, subsequent to the freeze, must be in accordance with further standards as developed by the Executive. This requirement, inherent in the Rule of Law and implicit in the Act, means that however broad the discretion of the Executive at the outset, the standards once developed limit the latitude of subsequent executive action.

The Stabilization Act of October 2, 1942, directed the President "to issue a general order stabilizing prices, wages and salaries, affecting the cost of living" with authority to make adjustments "to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities." 56 Stat. 765.

That the broad and well known programs for administration of stabilization measures may be taken, especially in view of the annual extensions (see note 29), as interpretations congruent with Congressional contemplation, *see* Allen v. Grand Cent. Aircraft Co., *supra*, 347 U.S. at 544–545, 74 S.Ct. at 745.

The importance in present context of this self-limiting aspect of executive and agency discretion is brought out in Yakus v. United States, *supra*. After noting that the Constitution does not demand the impossible, that the essentials of the legislative function are preserved with a determination of legislative policy, Chief Justice Stone continues:

> It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework.[36]

The crucial paragraph of the opinion specifically relies on the reasoning of Executive administration as helping to supply the requisite specificity and precision:

> [T]he standards prescribed by the present Act, with the aid of the "statement of the considerations" required to be made by the Administrator, are sufficiently definite and precise to enable Congress, the Courts and the public to ascertain whether the Administrator, in fixing the designated prices, has conformed to those standards. [Citation] Hence we are unable to find in them an unauthorized delegation of legislative power.[37]

The requirement of subsidiary administrative policy, enabling Congress, the courts and the public to assess the Executive's adherence to the ultimate legislative standard, is in furtherance of the purpose of the constitutional objective of accountability. This 1970 Act gives broadest latitude to the Executive. Certainly there is no requirement of formal findings. But there is an on-going requirement of intelligible administrative policy that is corollary to and implementing of the legislature's ultimate standard and objective. This requirement is underscored by the consideration that the exercise of wide discretion will probably call for "imaginative interpretation," leaving the courts to see whether the executive, using its experience, "has fairly exercised its discretion within the vaguish, penumbral bounds" of the broad statutory standard. F. C. C. v. RCA Communications, Inc., 346 U.S. 86, 90–91, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953).

In view of the administration of the prior two stabilization programs[38] the Government cannot sensibly contend that the requirement of development of administrative standards is unattainable or would reduce to a futility the legislative objective of controlling inflation.

11. *Applicability of Administrative Procedure Act provisions on administrative rule-making and judicial review*

The claim of undue delegation of legislative power broadly raises the challenge of undue power in the Executive and thus naturally involves consideration of the interrelated questions of the availability of appropriate restraints through provisions for administrative procedure and judicial review. These components of fairness are themselves elements of statutory and constitutional rights but it is appropriate to discuss them in present context because they bear on the issue whether there has been undue delegation to the Executive.

The safeguarding of meaningful judicial review is one of the primary functions of the doctrine prohibiting undue delegation of legislative powers. That this element of the doctrine, which was noted in *Yakus*, has current vitality is brought out by the observation of Justice Harlan in Arizona v. California, 373 U.S. 546, 626, 83 S.Ct. 1468, 1511, 10 L.Ed.2d 542 (1963):

> [The doctrine] prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to

---

36. 321 U.S. at 425, 64 S.Ct. at 667.

37. 321 U.S. at 426, 64 S.Ct. at 668.

38. See text to fn. 17, above.

judge the official action that has been challenged.

■ The Government concedes and we agree that the Executive's actions under the 1970 Act are not immune from judicial review. There are occasions when Congress has so committed matters to executive discretion as to avoid judicial review or to remove judicial review for error of law, including abuse of discretion, restricting it to the narrow function of correcting flagrant disregard of a clear-cut legislative mandate. These occasions are, however, the rare exception [39] arising only in such fields as foreign affairs and national defense,[40] or where Congress has expressly or impliedly directed that the Executive proceed without statement of reasons because the functioning must rest on confidence or be conducted with extraordinary expedition,[41] or where the legislature manifests an intent to avoid review in order to further its objective, as where a failure to exercise discretion to exempt is made non-reviewable in furtherance of the objective of narrow exemptions.[42]

The Government's position rests on the proposition that since the Act provides for enforcement either by way of fine (§ 204), or by way of injunction restraining violations (§ 205), and the person charged with violation is able to obtain judicial review by inserting a defense to either type of enforcement proceeding, this provides ample judicial review for constitutional purposes.

We need not consider whether under conditions of modern life the Constitution permits a restriction to enforcement proceedings of judicial review of Executive discretion as broad in range and significant in impact as that provided by this law, requiring citizens with substantial doubts concerning the validity of the exercise of such broad discretion to run the risk of criminal proceedings. Compare Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

■ It is our conclusion that in addition to the judicial reviews noted by the Government, challenges may be made under the provisions for judicial review in the Administrative Procedure Act, 5 U.S. C. §§ 701–706. These provisions contemplate an action for declaratory judgment or injunction, assuming pertinent requirements for these forms of action are met, as well as a defense in civil or criminal proceedings, see 5 U.S.C. § 703. They provide that a person suffering legal wrong because of agency action is entitled to review thereof, 5 U.S.C. § 702. Judicial review is provided for final agency action for which there is no other adequate remedy in court, 5 U.S.C. § 704.

■■ When the impact of regulations is direct and immediate, so that the controversy is "ripe" for judicial resolution, these provisions of 5 U.S.C. §§ 701–706, permit pre-enforcement judicial review. There is a basic presumption of judicial review. The courts restrict access to judicial review only upon a showing of clear and convincing evidence of a contrary legislative intent. Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ Pre-enforcement judicial review may be withheld when regulations do not have an immediate impact on the complainant and only minimal adverse consequences will be involved if the regulation is challenged in an enforcement proceeding. Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 164–166, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

We have no occasion to expatiate on these familiar provisions and principles for judicial review of agency actions, or

39. See Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

40. Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (en banc, 1969).

41. City of Lafayette v. SEC, D.C.Cir., 454 F.2d 941 (1971); Int'l Ass'n of Mach. & A. Wkrs. v. Nat'l Med. Bd., 138 U.S.App.D.C. 96, 425 F.2d 527 (1970).

42. The Wheelabrator Corp. v. Chafee, D. C.Cir., 455 F.2d 1306 (1971).

to determine what kinds of agency action under the 1970 Act may be classified as "final" and reviewable, or when some court remedy other than direct review may be "adequate." We merely note that we see no indication whatever, let alone the "clear and convincing evidence" required by the Supreme Court decisions, that the actions taken under the 1970 Act are removed from the judicial review provisions of 5 U.S.C. §§ 701–706.

The term "agency" is defined broadly. See 5 U.S.C. § 701(b) (1):

§ 701. Application; definitions

(b) For the purpose of this chapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

\* \* \* \* \* \*

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41; or sections 1622, 1884, 1891–1902, and former section 1641(b) (2), of title 50, appendix; and

The leading students of the APA, whose analyses are often cited by the Supreme Court, and who on some matters are in conflict with each other, seem to be in agreement that the term "agency" in the APA includes the President[43]—a conclusion fortified by the care taken to make express exclusion of "Congress" and "the courts."

 But we need not consider whether an action for judicial review can be brought against the President *eo nomine*. Certainly such actions can be brought against the official who exercises functions vested by Congress in the President and delegated by the President

to him.[44] The Cost of Living Council is an "authority" of the United States and Executive Order 11615 was only recording the incontrovertible when it specified that the Council "shall act as an agency of the United States."

None of the other exceptions listed in 5 U.S.C. § 701(b) (1) are applicable. Indeed it is significant that Congress failed to bring the Act within the exception of (H). For (H) does exclude from the definition of "agency" functions performed under the Defense Production Act. It is noteworthy that Public Law 91–379 has two Titles. Title I is captioned "Defense Production Act Amendments" and its four sections constitute amendments of the Defense Production Act. However Title II of Public Law 91–379, captioned "Cost of Living Stabilization," is in no way made part of or referable to the Defense Production Act. Indeed, it has even been codified as a part of Title 12 of the U.S.Code, Banks and Banking, appearing in a footnote to 12 U.S.C. § 1904. The applicability of the Administrative Procedure Act cannot be doubted.

 By the same token actions under this 1970 Act are subject to the administrative procedure provisions of the Administrative Procedure Act, 5 U.S.C. § 551 ff. It may well be that the applicability of these provisions will have no practical consequence. The rule-making provisions of 5 U.S.C. § 553, requiring notice and opportunity for participation by interested persons, are subject to the provision in subsection (b) removing those requirements "(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." The adjudication provisions of 5 U.S.C. § 554

43. R. Berger, Administrative Arbitrariness —A Synthesis, 78 Yale L.J. 965, 997 (1969) ; K. Davis, Administrative Arbitrariness—A Postscript, 114 U. of Pa.L. Rev. 823, 832 (1966) ; L. Jaffee, The Right to Judicial Review, 71 Harv.L.Rev. 401, 769, 778, 781 (1958).

44. E. g., Gulf Oil Corp. v. Hickel, 303 F. Supp. 31, 32 (D.D.C.1969), affirmed 140 U.S.App.D.C. 368, 435 F.2d 440 (1970).

are applicable only when an agency hearing is required by the statute, or by compulsion of general law, *cf.* Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950). And *Yakus* upheld the validity of the failure to provide for such hearings in the 1942 maximum price law.

After the foregoing was written the court received the Congressional Record for October 19, 1971, which contains (at p. S 16414) the Administration's legislative proposal for Phase II of the stabilization program. The assumption that the courts would or at least might reach the conclusion set forth in the preceding paragraph presumably accounts for the inclusion in that proposal of a section 207, "Administrative review," that would provide an exemption from the APA.

In the context of the applicability of the *general provisions of the Administrative Procedure Act*, as amended, both as to administrative procedure and judicial review, it is hollow to say that the 1970 Act was void *ab initio* for failure to make provision for these matters. We have no basis or warrant for considering —or rather speculating—in this action whether the ongoing administration of the stabilization program may become subject to challenge for failure to provide reasonable and meaningful opportunity for interested persons to present objections or inequities that undercut the premise of broad equity, or for officials to take these into account, or for courts to discharge their function of judicial review.

*12. Discussion of Schechter and other plaintiff precedents*

■■■ We end this section of the opinion with broad closing references to precedent. First a last word as to *Yakus.* We do not understand *Yakus* to rest in a crucial sense of the exercise of the war power. No claim is made to us that this 1970 law lies outside the substantive powers of Congress, but only that its powers should have been exer-

cised with different techniques. Nor does *Yakus* depend on the existence of the state of war as a condition. As pointed out by Justice Rutledge, in a dissenting opinion that concurred with the majority on this issue, 321 U.S. at 462–463, 64 S.Ct. at 685, the legislation "as the Court's opinion demonstrates, does not go beyond the limits allowed by peacetime precedents in the substantive delegation."

We turn finally to precedents cited by the Union. They remind us that Separation of Powers is a doctrine with vitality. It is the force that motivated Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)—where however the executive order seizing the nation's steel mills was without any authorization in legislation. Given a legislative enactment, there have not been any Supreme Court rulings holding statutes unconstitutional for excessive delegation of legislative power since the *Panama Refining* and *Schechter* cases invalidated provisions of the National Industrial Recovery Act of 1933.

These cases express a principle that has validity—reserved for the extremist instance. These precedents were referred to in Fahey v. Mallonee, 332 U.S. 245, 249, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947):

> Both cited cases dealt with delegation of a power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom.

They are without vigor for a case like the one before us, where the delegation is in a context of historical experience with anti-inflation legislation.

The particular application of the delegation principle in *Panama Refining* was colored, as students of the Court's decisions have noted, by the circumstance that the regulation in that case was not generally available and had been inadvertently amended out of effect—a

circumstance that led to the creation of the Federal Register.

In *Schechter*, which held invalid the provisions of the National Industrial Recovery Act that authorized the fixing of codes of fair conduct, the "function of formulating the codes was delegated, not to a public official responsible to Congress or the Executive, but to private individuals engaged in the industries to be regulated." Yakus v. United States, *supra*, 321 U.S. at 424, 64 S.Ct. at 667; Fahey v. Mallonee, *supra*, at 249, 67 S.Ct. 1552. The "corporate state" aspects of the Blue Eagle codes that emerged in practice were made possible and reinforced by a legal context of authority to prescribe "codes of fair competition" that covered the entire range of economic life, going beyond even the broad subject matter before us.

A supplemental memorandum in another lawsuit has raised the question that the President's plans for a Price Commission and a Pay Board do present the very kind of delegation of government power to private groups that was involved in *Schechter*. That claim has not been put forward by the plaintiff in this case, possibly because the Union has different litigating interest. We note the point only to say that we do not and are not required to pass on it. We have no way of knowing whether or to what extent the President will delegate authority to persons who are not, at least pro tanto, part of a government agency, or will provide for review of their exercise of such authority. More important, any such delegation is not inherent in the Act as passed. The presumption must be that Congress, in vesting power in the President, contemplated only such further delegation as would be consistent with law, including the requirement that the orders providing for stabilization be issued on a basis that accords with general fairness and avoids gross inequity, and provide for administration and procedures that are meaningfully consistent with that standard. If there should be a problem with the administration provided by the President, whether as to structure or procedure it may be subject to attack as not consistent with the Act, but it does not render the Act void *ab initio*, which is the Union's core claim.

*Schechter* has fairly been described as a ruling that administered "the hemlock of excessive delegation" in a case of "delegation run riot.[45]" We think the extremist pattern then before the Court cannot fairly be analogized to the anti-inflation statute, limited in life and passed in a context of experiences with similar legislation, that is before us for consideration.

## C. OTHER LEGAL CHALLENGES

The Union's other challenges are all on matters that doubtless concern the Union deeply but do not present significantly troublesome legal questions.

### 1. *Applicability to existing contracts*

The Union complains that its contracts have been impaired without constitutional authority or validating executive findings. But it is plain beyond doubt that contracts do not fetter the constitutional authority of Congress. Norman v. B. & O. R., 294 U.S. 240, 307–310, 55 S.Ct. 407, 79 L.Ed. 885 (1935); Louisville & N. R. v. Mottley, 219 U.S. 467, 482, 31 S.Ct. 265, 55 L.Ed. 297 (1911). "Immunity from federal regulation is not gained" either through "forehanded contracts," see Fleming v. Rhodes, 331 U.S. 100, 107, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947), or through contracts that, however commendable when signed, would frustrate government programs if carried into effect.

There is little point in marshalling the cases on the impairment of contracts clause of the Constitution since this is applicable, on its face, only to the states. As to the Federal Government our concern is with the due process clause.

Whatever may be said as to the need for reasoning to override contracts

---

45. T. R. Powell, Vagaries and Varieties in Constitutional Interpretation (Col.U.Press) p. 79.

in some other context, it was not required for the general freeze so plainly within Congressional contemplation. The Executive Order operates in futuro, to wage increases becoming effective subsequent to its issuance.

While questions may arise as to the significance to be given prior contracts in any ongoing administration of the Act, those relate at least in the first instance to considerations of subsidiary administrative policy for implementation of the statute.

### 2. *Applicability to fringe benefits*

The other principal question put to us is that the authority under the 1970 law to stabilize "wages, salaries" does not include the authority to control fringe benefits.

■■ The Union attaches decisive significance to the absence, in the Act, of the words "and other compensation," a phrase that appeared in the Defense Production Act of 1950, and which in the Union's view "clearly evinced Congressional intent to cover all forms of remuneration." The decisive significance attached by the Union to the wording in the 1950 law "any wage, salary, or other compensation" is contrary to the analysis in Allen v. Grand Cent. Aircraft Co., 347 U.S. 535, 546, 74 S.Ct. 745, 751, 98 L.Ed. 933 (1954) where the Court took note that the 1950 wording differed from "wages or salaries" phrase in the 1942 law, and observed: "[T]he substance of the two sections is inescapably the same."

■■■ The contemporaneous interpretation of the 1970 law by the Executive is to be accepted unless palpably unreasonable or contrary to discernible legislative intention. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The legislature was concerned with the 1970 condition of "cost-push" inflation, as contrasted with the "demand-pull" inflationary conditions of 1942 and 1950. This supports control in 1970 of items like fringe benefits which inevitably enter into the cost structure, and thus intensify cost-push inflation, even though the lack of added money in the pockets of the worker would lessen the impetus to "demand-pull" inflation.

\* \* \*

■■■ A motion for a preliminary injunction normally entails consideration of the "probability" of success on the merits. The nature of the presentation made to this court, and the clear implication that none of the parties contemplated a further stage of this litigation for the purpose of presenting evidence, have led this court to consider the issues on the assumption that what all concerned have in mind is a determinative ruling on the legal issues. Our view of the applicable law makes it clear that plaintiff's motion for injunctive relief must be denied.

So ordered.

### ANNEX "A"

Act of August 15, 1970, P.L. 91–379, 84 Stat. 799 (as amended by P.L. 91–558, 84 Stat. 1468; P.L. 92–8, 85 Stat. 13; P.L. 92–15, 85 Stat. 38).

To amend the Defense Production Act of 1950 and for other purposes.

\* \* \* \* \* \*

### TITLE II—COST OF LIVING STABILIZATION

#### § 201. *Short title*

This title may be cited as the "Economic Stabilization Act of 1970."

#### § 202. *Presidential authority*

(a) The President is authorized to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970. Such orders and regulations may provide for the making of such adjustments as may be necessary to prevent gross inequities.

(b) The authority conferred on the President by this section shall not be exercised with respect to a particular industry or segment of the economy unless the President determines, after taking into account the seasonal nature of

employment, the rate of employment or under-employment, and other mitigating factors, that prices or wages in that industry or segment of the economy have increased at a rate which is grossly disproportionate to the rate at which prices or wages have increased in the economy generally.

§ 203. *Delegation*

The President may delegate the performance of any function under this title to such officers, departments, and agencies of the United States as he may deem appropriate.

§ 204. *Penalty*

Whoever willfully violates any order or regulation under this title shall be fined not more than $5,000.

§ 205. *Injunctions*

Whenever it appears to any agency of the United States, authorized by the President to exercise the authority contained in this section to enforce orders and regulations issued under this title, that any person has engaged, is engaged or is about to engage in any acts or practices constituting a violation of any regulation or order under this title, it may in its discretion bring an action, in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. Upon application of the agency, any such court may also issue mandatory injunctions commanding any person to comply with any regulation or order under this title.

§ 206. *Expiration*

The authority to issue and enforce orders and regulations under this title expires at midnight April 30, 1972, but such expiration shall not affect any proceeding under section 204 for a violation of any such order or regulation, or for the punishment for contempt committed in the violation of any injunction under section 205, committed prior to May 1, 1972.

## ANNEX "B"
## EXECUTIVE ORDER NO. 11615

August 17, 1971, 36 F.R. 15727

### PROVIDING FOR STABILIZATION OF PRICES, RENTS, WAGES AND SALARIES

WHEREAS, in order to stabilize the economy, reduce inflation, and minimize unemployment, it is necessary to stabilize prices, rents, wages, and salaries; and

WHEREAS, the present balance of payments situation makes it especially urgent to stabilize prices, rents, wages, and salaries in order to improve our competitive position in world trade and to protect the purchasing power of the dollar:

NOW, THEREFORE, by virtue of the authority vested in me by the Constitution and statutes of the United States, including the Economic Stabilization Act of 1970 (P.L. 91–379, 84 Stat. 799), as amended,[92] it is hereby ordered as follows:

Section 1. (a) Prices, rents, wages, and salaries shall be stabilized for a period of 90 days from the date hereof at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services. If no transactions occurred in that period, the ceiling will be the highest price, rent, salary or wage in the nearest preceding 30-day period in which transactions did occur. No person shall charge, assess, or receive, directly or indirectly in any transaction prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay in any transaction wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted here-

under, whether by retroactive increase or otherwise.

(b) Each person engaged in the business of selling or providing commodities or services shall maintain available for public inspection a record of the highest prices or rents charged for such or similar commodities or services during the 30-day period ending August 14, 1971.

(c) The provisions of sections 1 and 2 hereof shall not apply to the prices charged for raw agricultural products.

Sec. 2. (a) There is hereby established the Cost of Living Council which shall act as an agency of the United States and which is hereinafter referred to as the Council.

(b) The Council shall be composed of the following members: The Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Labor, the Director of the Office of Management and Budget, the Chairman of the Council of Economic Advisers, the Director of the Office of Emergency Preparedness, and the Special Assistant to the President for Consumer Affairs. The Secretary of the Treasury shall serve as Chairman of the Council and the Chairman of the Council of Economic Advisers shall serve as Vice Chairman. The Chairman of the Board of Governors of the Federal Reserve System shall serve as adviser to the Council.

(c) Under the direction of the Chairman of the Council a Special Assistant to the President shall serve as Executive Director of the Council, and the Executive Director is authorized to appoint such personnel as may be necessary to assist the Council in the performance of its functions.

Sec. 3. (a) Except as otherwise provided herein, there are hereby delegated to the Council all of the powers conferred on the President by the Economic Stabilization Act of 1970.

(b) The Council shall develop and recommend to the President additional policies, mechanisms, and procedures to maintain economic growth without inflationary increases in prices, rents, wages, and salaries after the expiration of the 90-day period specified in Section 1 of this Order.

(c) The Council shall consult with representatives of agriculture, industry, labor and the public concerning the development of policies, mechanisms and procedures to maintain economic growth without inflationary increases in prices, rents, wages, and salaries.

(d) In all of its actions the Council will be guided by the need to maintain consistency of price and wage policies with fiscal, monetary, international and other economic polices of the United States.

(e) The Council shall inform the public, agriculture, industry, and labor concerning the need for controlling inflation and shall encourage and promote voluntary action to that end.

Sec. 4. (a) The Council, in carrying out the provisions of this Order, may (i) prescribe definitions for any terms used herein, (ii) make exceptions or grant exemptions, (iii) issue regulations and orders, and (iv) take such other actions as it determines to be necessary and appropriate to carry out the purposes of this Order.

(b) The Council may redelegate to any agency, instrumentality or official of the United States any authority under this Order, and may, in administering this Order, utilize the services of any other agencies, Federal or State, as may be available and appropriate.

(c) On request of the Chairman of the Council, each Executive department or agency is authorized and directed, consistent with law, to furnish the Council with available information which the Council may require in the performance of its functions.

(d) All Executive departments and agencies shall furnish such necessary assistance as may be authorized by section 214 of the Act of May 3, 1945 (59 Stat. 134; 31 U.S.C. 691).

Sec. 5. The Council may require the maintenance of appropriate records or other evidence which are necessary in

carrying out the provisions of this Order, and may require any person to maintain and produce for examination such records or other evidence, in such form as it shall require, concerning prices, rents, wages, and salaries and all related matters. The Council may make such exemptions from any requirement otherwise imposed as are consistent with the purposes of this Order. Any type of record or evidence required under regulations issued under this Order shall be retained for such period as the Council may prescribe.

Sec. 6. The expenses of the Council shall be paid from such funds of the Treasury Department as may be available therefor.

Sec. 7. (a) Whoever willfully violates this Order or any order or regulation issued under authority of this Order shall be fined not more than $5,000 for each such violation.

(b) The Council shall in its discretion request the Department of Justice to bring actions for injunctions authorized under Section 205 of the Economic Stabilization Act of 1970 whenever it appears to the Council that any person has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any regulation or order issued pursuant to this Order.

RICHARD NIXON

THE WHITE HOUSE,
*August 15, 1971.*

ANNEX "C"

| 91st CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| *2nd Session* | | No. 91–1330 |

## DEFENSE PRODUCTION ACT EXTENSION AND ECONOMIC STABILIZATION ACT

July 27, 1970.—Committed to the Committee of the Whole House on the State of Union and ordered to be printed

Mr. Patman, from the Committee on Banking and Currency, submitted the following

REPORT

together with

MINORITY VIEWS AND ADDITIONAL VIEWS

[To accompany H.R. 17880]

\* \* \* \* \* \*

### TITLE II—COST-OF-LIVING STABILIZATION

This title of H.R. 17880 would provide *discretionary* authority to the President to issue orders and regulations to stabilize prices, rents, wages, and salaries at levels of not less than those prevailing on May 25, 1970.

This discretionary authority would expire on February 28, 1971. It is envisaged that the freeze, to be effective in

getting a handle on inflation, would need to be enforced for only 2 or 3 months. Title II of H.R. 17880 reflects a sincere congressional willingness to do its part—and to share the consequences—in a meaningful attack on inflation.

Under this legislation the President would have the authority to determine whether or not such orders and regulations should be issued. Further, the President would have the authority to make any adjustments within such orders and regulations as deemed necessary to prevent any inequities that might occur as the result of such stabilization orders.

This title should be thought of in conjunction with the authority given by the Congress to the President in Public Law 91–151, enacted in December 1969, whereby the President was given authority to impose selective controls over any or all forms of credit when he determines that such action would be necessary or appropriate for the purpose of preventing or controlling inflation generated by the extension of excessive credit.

The combination of these two provisions—discretionary control authority granted the President last year and the proposed authority provided in this legislation—will, in the opinion of your committee, provide the President with all of the tools necessary to control inflation, while at the same time providing for healthy economic growth. In this way we will not need to rely exclusively on fiscal and monetary actions which place an inordinate burden on those segments of our economy and society least able to bear them.

Many economists, many Members of Congress, some of whom have introduced legislation similar to title II of H.R. 17880, labor leaders, the AFL–CIO, mayors of some of our Nation's largest cities, and others have called on the Congress to provide discretionary standby authority to the President to impose wage, price, rent, and salary controls to combat and break the back of inflation and the inflation psychology which pervades our thinking and our economy.

A Gallup poll conducted in the middle of June clearly indicates the wishes of the American people in this matter. This poll concluded that if the question on wage and price controls "were put to the people of the Nation in the form of a referendum, * * * they would * * vote in favor of mandatory controls."

Many Members of Congress have received letters and an overwhelming response to questionnaires which they have sent their constituents favoring the institution of wage and price controls on an equitable basis at this time. A distinguished member of our own committee from the minority party, Hon. Albert W. Johnson, Republican, of Pennsylvania, perhaps has clearly reflected the views received by many Members of Congress when he said during the committee hearings on this legislation, " * * I just finished tabulating a questionnaire from the people in my district and 69 percent said they favor compulsory wage and price controls at this time in order to control inflation."

It is the firm opinion of the majority of the members of your committee that if the Congress, in its wisdom, enacts this legislation, the President will have all of the necessary weapons needed to control inflation.

No one can doubt that inflation is still on a rampage in our economy. The cost-of-living figures released on July 22 indicated that prices have risen in the first half of this year at a 6 percent annual rate. Granted that this rate of increase is insignificantly less than that experienced in the first half of last year, this in no way provides any solace to the unemployed, the aged, and others living on fixed incomes, and the wage earner who finds his wages continually eroded by increases in the cost of living. This same inflation is responsible for the housing depression, the balance-of-payments crisis, and the current liquidity squeeze.

The majority of your committee finds that the "economic game plan" imposed by the administration has created fantastically high levels of unemployment and, at the same time, done nothing to

effectively reduce living costs. Many economists, including at least one academic economist who is a close adviser to the President, has indicated that the unemployment rate at the end of this year would probably approach or exceed 6 percent. Already unemployment in various industries is running at alarming levels. For example, the unemployment rate for construction workers in a most recent month was at 9.1 percent; for unskilled, 8.1 percent; for Negroes, 8 percent; and for the semiskilled, 6.7 percent.

Coupled with the continual price rise, the average workweek for factory workers is down substantially—to the lowest level since the recession year of 1961. As a result, last year the average weekly earnings of workers in the United States has increased less than the rise in living costs and brought the buying power of the worker's weekly pay check down to a level below that which it was 5 years ago!

The unfortunate "economic game plan" of the administration has also created a situation whereby the homebuilding industry and home mortgage market is in a depression. The commitment which Congress gave to the American people in the Housing Act of 1968—to provide 26 million additional units of housing in the next decade—obviously cannot be met at current levels of construction. Currently, new units are being provided, at best, at only half the annual rate needed to meet this goal. Home mortgage interest rates are at all-time highs and not only our low- and moderate-income people, but also middle-income people cannot afford to acquire a home. But yet the cost of living—inflation—continues rampantly on.

Our Nation cannot suffer through another recession without doing extreme damage to the goals which we have set for ourselves over the coming years. We cannot allow productivity to be stifled by willfully promulgating economic policies at the national level to increase unemployment, reduce productivity, and curtail the full use of all of our productive capacities.

Historic fact and economic analysis clearly indicate that once price and wages are brought under control, interest rates can be drastically reduced. Currently, the high level of interest rates include a large percentage for expected inflation. There is no question that interest rates themselves are inflationary in nature. When one looks at the level of interest rates now being demanded and obtained in the market of 10 percent or more, perhaps 6 percent of that can be accounted for by expected increases in prices during the coming year.

Those members of your committee who argued against this title during committee hearings and voted against this title during the executive sessions, argued that legislation providing for wage and price freezes should be mandated by the Congress if the Congress desires this authority, and not left up to the discretion of the President. The majority of your committee argued that this is an obvious ploy to detract attention from the fact that this responsibility must reside with the President and within the executive branch. The Congress itself is neither constituted or organized to take on this function. It is not a legislative function, both in terms of appropriate timing in instituting the controls and removing them, since only the Executive can determine the appropriate time for instituting the controls and removing them, and only the Executive is equipped to determine and establish the necessary rules and regulations to carry out the law once imposed.

The majority of your committee who voted for title II of H.R. 17880 deemed it highly improper for the Congress to mandate such authority. In supporting this proposal it was argued that one could easily envision the possibility that, once having imposed wage-price-salary-rent freezes, a few months hence it would be necessary to remove them in whole or in part. But if the Congress had mandated such action through to the

termination date of February 28, 1971, as set forth in the bill, it would well be days or weeks before such action would be rescinded by the Congress if needed and, indeed, the Congress itself may not be in session when it would be appropriate to remove such controls.

For these reasons, the majority of your committee feels that such standby authority must be left to the discretion of the President and not mandated.

In summary, our economy has been and is now faced with the most anomalous situation of recession in some quarters with high unemployment rates, lack of productive activity in the homebuilding and other essential industries, and, at the same time, substantial inflation in terms of continued rapidly increasing prices and all-time high interest rates. This anomalous situation can be corrected by giving the President the appropriate tools to correct the situation. These legislative tools include the selective credit controls given to the President in Public Law 91-151, enacted last year, and the proposed wage-price-salary-rent discretionary authority proposed in this legislation.

With these tools the President will have a full opportunity to bring the economy under control and put an end to the twin economic evils of inflation and recession which has plagued the country in recent months.

## MINORITY VIEWS

H.R. 17880 as reported is a better bill than the bill which was introduced. It has received our support because without it the Defense Production Act of 1950 would expire. However, we cannot concur with the majority views on title II—Costs of Living Stabilization.

\* \* \* \* \* \*

Title II bears the innocuous title "Cost of Living Stabilization" but actually conveys authority on the President to freeze prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970 until February 28, 1971, slightly after the upcoming election. Consider-

ing that titles of bills should relate to the subject matter following in a manner that identifies it correctly we might better have entitled this unwanted and unneeded title as the "Election Year Squeezeplay" or "Devious Democratic Demagogery." The fact of the matter is that the only real need for this authority is the majority's need for some means of screening the root causes of current economic problems from the electorate. Attacks on the President for not using this authority, which he has announced in advance he will not use, will be the device for creating the screen.

The action of the majority in pushing this proviso through the committee on a straight party line vote parallels its action last December in enacting standby credit controls. The only note of gratification is that these new authorities will be less useful as a political gimmick because despite all criticisms, irresponsible congressional spending and the heritage of huge war expenditures, the President's program to control inflation is now paying off. There is really no doubt that responsible fiscal and monetary policies are a more effective and economical means of controlling inflation than administered controls over prices, wages, and credit.

It is interest to note that during World War II over a quarter million people were involved in administering the price stabilization effort. During the Korean war a much smaller and less ambitious control effort employed more than 17,000 people and cost over $137 million. It is totally unrealistic to enact control authority for a 7-month period such as this bill would do. Is there anyone so foolish as to think that the bureaucracy to administer the controls could even be assembled in this time?

The case against wage and price controls is no better summarized than in the 1969 report of President Johnson's Council of Economic Advisers, which stated:

Mandatory price and wage controls \* \* \* freeze the market mechanism which guides the economy in respond-

ing to the changing pattern and volume of demand; they distort decisions on production and employment, they require a huge and cumbersome bureaucracy; they impose a heavy and costly burden on business; they perpetuate inevitable injustices. They are incompatible with a free enterprise economy and must be regarded as a last resort appropriate only in an extreme emergency such as all-out war.

WILLIAM B. WIDNALL.
FLORENCE P. DWYER.
SEYMOUR HALPERN.
W. E. BROCK.
ALBERT W. JOHNSON.
J. WILLIAM STANTON.
CHESTER L. MIZE.
BENJAMIN B. BLACKBURN.
GARRY BROWN.
LAWRENCE G. WILLIAMS.
CHALMERS P. WYLIE.
MARGARET M. HECKLER.
WILLIAM O. COWELR.
PHILIP M. CRANE.
CLARK MacGREGOR.

## ADDITIONAL VIEWS ON H.R. 17880

H.R. 17880 has as its primary purpose, the extension of the Defense Production Act of 1950 from June 30, 1970, to June 30, 1972. With this purpose, no one on the Banking and Currency Committee disagrees. With respect to the extraneous provisions which have been added to this "vehicle," there is much disagreement of varying severity.

This disagreement occurs on the question of adoption of cost-accounting standards and by whom such standards shall be developed; and, on the issue of enactment of standby authority in the President for imposition of wage and price controls.

\* \* \* \* \* \*

### WAGE AND PRICE CONTROLS

At the outset, let me say that my constituency on the only two occasions in the last 3 years when I have asked the question on my legislative questionnaire, has by a wide plurality, voted for the imposition of wage and price controls. When I let my irritation over inflation prevail over my judgment, I often say to myself, "Yes, let's invoke them." But even as a rather mediocre student of economics, I know that wage and price controls are not the answer to the type of economic destabilization we are now suffering.

Yet, I am willing, if are my colleagues, to bite the bullet and put the machinery of controls into being. But, I refuse to aline myself with my spineless colleagues who would pass the buck to the President as many of them did in similarly broad language in the Gulf of Tonkin standby authority.

The total insincerity of title II, the wage and price control provisions, of this bill is pointed out in the minority views in this report.

The almost unlimited grant of authority to the President to impose and implement wage and price controls provided for in title II would be considered ludicrous were it not so serious.

At a time when the electorate and some Members of Congress are vehemently criticizing the failure of the Congress to assume greater authority and responsibility in the warmaking power the President is exercising in international affairs, it is almost unbelievable that anyone would suggest the Congress totally abdicate its responsibility and retain no authority with respect to the power of the President to wage war on the economy.

It has been suggested that the wage and price control provisions of title II are similar to those previously enacted by the Congress. This is pure hogwash. Any examination of economic controls enacted in the past would establish that on those occasions when legislation of this nature was enacted, section after section of guidelines, standards, limitations, and directions for implementation were included.

To hear the chairman of the Banking and Currency Committee unabashedly praise this legislation when he spoke on

the House floor the other day, was insulting to the intelligence of the membership of this body. How he could keep a straight face while performing such a rank political ploy defies explanation.

As I have previously indicated, I have serious doubts about the wisdom of imposing wage and price controls because I believe they would be counterproductive in our effort to stem inflation. I, therefore, believe title II of this legislation should be stricken. If title II is not stricken, then it is imperative that the amendment I will offer be adopted.

Briefly stated, my amendment provides the standby authority necessary for the invoking of wage and price controls. But there is a significant difference between my amendment and the provisions of title II. My amendment retains authority in the Congress to invoke a wage and price freeze and then grants to the President the authority to make adjustments in wages and prices necessary for the stabilization of the economy and prevention or elimination of inequities within our wage and price structure.

To permit timely action, my proposal delegates to a joint committee consisting of the Joint Economic Committee, the Speaker and minority leader of the House, and the majority leader and minority leader of the Senate, the authority to determine when and if the wage and price control provisions shall be activated.

There are those who may argue that this delegation of authority to a joint committee of the Congress is improper or even unlawful. Such an argument is clearly without merit. Not only is our statute law full of examples of such delegation of authority but, in addition, the theory has become an axiom that any authority of this nature which may be delegated to the executive branch may be retained by the Congress and may be exercised to a statutorily designated committee or body of the Congress.

In essence, my amendment puts the issue of standby authority for wage and price controls in an absolutely clear con-

text. If such standby authority is to be enacted, responsible Members of Congress will support my amendment and those who only wish to play politics will oppose it.

GARRY BROWN (Michigan).

We concur in these additional views.

LAWRENCE G. WILLIAMS.
ALBERT W. JOHNSON.