**UNITED STATES of America,
Plaintiff,**

v.

**CINCINNATI TRANSIT, INC.,
Defendant.**

**No. 8250.**

United States District Court,
S. D. Ohio, W. D.

Jan. 28, 1972.

William C. McCorriston, Dept. of Justice, Washington, D.C., Philip S. Olinger, Asst. City Sol., Cincinnati, Ohio, for plaintiff.

Benjamin Gettler, Cincinnati, Ohio, for defendant.

MEMORANDUM OF DECISION
AND ORDER

PORTER, District Judge.

This is a case of first impression under the recently enacted Wage and Price Stabilization Act. It has mushroomed as a result of violent disagreement as to whether a service cutback and fare in-

crease violated Phase I and II Price Freeze Regulations.

We conclude that the fare increase violated Phase II regulations. We conclude that the service cutback, if not a Phase I violation, violated the Phase II regulations, and a prospective injunction should issue against any further such fare increases and/or service cutbacks without the certification required from the Director of Public Utilities of Cincinnati required by the regulations.

We reserve for determination at final hearing whether an injunction should issue requiring restoration of service cuts or, in the alternative, whether fares should be rolled back to reflect the savings resulting from such cuts. We also reserve for determination on final hearing whether money collected in violation of the freeze must be ordered accounted for the next time there is a fare increase so that it will inure to the benefit of bus riders. We also reserve for determination at final hearing whether the service cutback violated Phase I regulations, and, if so, what is appropriate in the way of injunctive relief.

The action is one for preliminary injunction and was brought by the United States pursuant to the Economic Stabilization Act of 1970, 84 Stat. 799, and the rules and regulations issued thereunder, specifically, § 205 of the Act. Jurisdiction is conferred by the Stabilization Act and 28 U.S.C. § 1345 (United States as a plaintiff).

The defendant is Cincinnati Transit, Inc., a public utility engaged in providing mass transportation in the form of bus service to the City of Cincinnati (City). Defendant took pains to file an action in this Court seeking a declaratory judgment and appellate review of an earlier adverse determination before the government filed its action seeking injunctive relief. No purpose was served by this "race to the Courthouse" because the cases were ordered consolidated at the hearing of the government's motion for injunctive relief, held December 29,

1971, and the company's motion to dismiss the government's suit was denied.

After consolidation we denied the company's request for declaratory relief from the bench for reasons given at the time and others mentioned herein. From the bench we also granted the City's motion to intervene.

The motion for a preliminary injunction is submitted on affidavits and from these and the professional statements of counsel we find the facts as follows:

Pursuant to an agreement between the defendant and the City which was entered into prior to the wage and price "freeze," August 15, 1971, the defendant was authorized to increase its bus fares 5¢ per ride across the board. Pending results of the vote to raise money for Southwestern Ohio Transportation Authority to assist public transportation, the defendant postponed the approved fare increase and, consequently, fares were frozen at the old level. However, on September 5, 1971, the defendant made a significant reduction in the number of bus runs. On the basis of the affidavits from persons representing the defendant a ruling was made by the General Counsel of the Board that such service reduction did not constitute a price increase and thus was not prohibited by the freeze. This favorable ruling was withdrawn shortly afterwards, and the defendant instituted an action in the United States District Court for the District of Columbia seeking a declaratory judgment sanctioning its service reduction. At the outset of Phase II, November 14, 1971, the defendant put the fare increase, previously approved by the City, into effect. The City and the Office of Emergency Preparedness (OEP) immediately notified the defendant that it was in violation of an OEP regulation, namely, § 300.016. The company demurred. Negotiations followed but got no place. This action followed.

The government argues that both the service reduction and the fare increase

are violations of Phase II and that the service reduction is a violation of Phase I regulations. The government claims that under § 205 of the Economic Stabilization Act, the defendant should be enjoined from any further fare increases or service reductions and ordered to roll back the fare increase already made and to restore the reduced service.

OEP (Economic Stabilization Regulation No. 1, § 10, 36 Fed. Reg. 16516 (Aug. 21, 1971)) provides that any practice which constitutes a means to obtain a higher price than permitted by this regulation is a violation of this regulation. Failure to provide the same services previously sold is given as an example of such a practice. In view of this and the admitted facts we conclude the government will probably prevail in its contention and that is one of the reasons for the decision that a prospective injunction should be issued against any further such service cutbacks without the certification required from the Director of Public Utilities of Cincinnati required by the regulations. However, as noted at the outset, we reserve for determination at final hearing whether an injunction should issue requiring restoration of service cuts or, in the alternative, whether fares should be rolled back to reflect the savings resulting from such cuts.

We have considered the Transit Company's contention that the service cut was merely a reduction in hours and concluded it is without merit. However, our finding is made solely for the purposes of this motion and is not intended to be binding upon the Agency which must decide this question when it is returned to the administrative level where it properly belongs at this stage. We recognize that if the negotiations which broke down are resumed the service reduction may be allowed by such Agency on the ground that it was to adjust to a decrease in demand and not to increase return on investment. We think it would be improper to concern ourselves with the merits of this until there has been appropriate administrative determination and the matter is before us on a proper appeal.

As all the foregoing implies, we conclude that § 300.016(b) does apply and under it the service reduction and price increase must be submitted to the local regulatory agency for review and certification that the price increase is consistent with the purposes of the Economic Stabilization Act.

Since this matter was submitted, the Transit Company has submitted an affidavit of the Director of Public Utilities indicating he is unable to certify that the price increase is consistent or inconsistent with the purposes of the Economic Stabilization Act. This affidavit should be withdrawn and directed to the Agency when the matter is returned for consideration at that level.

Section 300.016(b) provides that in case of a regulated public utility such as the defendant, a rate increase approved by a regulatory agency before November 14, 1971, as this one was, and not permitted to take effect because of the freeze, may take effect with respect to the transactions occurring after November 13, 1971, if the regulatory agency reviews the increase and certifies its consistency with the Act.

The certification requirement was added November 17, 1971, four days after the original was promulgated and three days after the rate increase. The defendant did not view the amendment as retroactive and was strongly of the opinion that it was governed exclusively by § 230. We hold that the amendment was retroactive and the defendant therefore had to submit not only service cuts but the fare increase for certification. The defendant is found to be in violation of § 300.016 and is therefore ordered to submit the fare increase and service reduction to the regulatory agency for review and certification that they are consistent with the Act and this must be done prior to final hearing.

Defendant Cincinnati Transit Company has raised the contention that the requirements of § 300.016(b) contain an

unconstitutional delegation of the President's power. We note that the constitutionality of the original delegation of power to the President by the Congress embodied in the Economic Stabilization Act has been upheld in the case of California Teachers Assn. v. Newport Mesa Unified School District, 333 F.Supp. 436 (C.D.Cal., 1971). That Court took judicial notice of "the conditions of an unstable economy, rising prices, decreasing sales, monetary depreciation, etc.," and set forth the congressional purpose of the Act: to give the President maximum authority for fighting inflation. The Court went on to articulate some of the principles evolved by the leading cases in the area. Thus, the delegation was upheld because the Act contains "intelligible principles" which "canalize" the field of delegated legislation narrowly enough to withstand constitutional scrutiny.

■ We think the analysis used in *California Teachers* must also be applied to the facts of this case. Standards or guidelines for the exercise of an agency's discretion are not viewed in isolation. They derive much of their meaning from the purpose of the Act, its factual background, and the statutory context in which they appear. American Power & Light v. S.E.C., 329 U.S. 90, 104, 67 S.Ct. 133, 91 L.Ed. 103 (1946).

In "Judicial Control of Administrative Action," L. Jaffe, (1965) * the author seems to say that during periods of emergency—at least until the Legislature becomes equal to the task—an otherwise improper delegation may be valid. See page 69. The rationale is to suffer minor infirmities for a short time to preserve the principle.

The case of Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), is cited by Jaffe as establishing a technique whereby courts may interpret the power delegated according to the ostensible purpose of the statute and the particular practices which have prevailed under it.

■ In summary, we think there are "intelligible standards" governing this delegation of power, and we therefore uphold § 300.016.

As to declaratory judgment, we question this on substantive grounds as well as those pertaining to discretion which have been and will be discussed.

■ The substantive grounds are that the government has not consented to be sued and the plaintiff has not exhausted administrative remedies. In a recent case in this Court, Civil Action No. 7450, James D. Hodgson, Secretary v. Keco Industries, Inc., we had occasion to discuss these points in connection with the Walsh-Healy Public Contracts Act and the Fair Labor Standards Act. WHPCA provided for administrative procedure to determine whether violations of the Act have transpired (41 U. S.C. § 39). In that connection it has been held that while the government may bring an enforcement action prior to completion of administrative procedures (see Unexcelled Chemical Corp. v. United States, 354 U.S. 59, 73 S.Ct. 580, 97 L.Ed. 821 (1963); United States v. Lovknit Mfg. Co., 189 F.2d 454 (5 Cir., 1951); United States v. Winegar, 254 F.2d 693 (10 Cir., 1958), the party contracting with the government under WHPCA is precluded from bringing a suit against the government before the administrative procedure has been exhausted. See Anderson v. Schwellenbach, 70 F.Supp. 14 (N.D.Cal., 1947).

This suit is against a number of individuals charged with the responsibility of implementing the Economic Stabilization Act and in effect is an action against the United States. Nowhere in the Act do we find anything indicating that the government has consented to be sued. There is, of course, provision, such as there is in WHPCA and the Fair Labor Standards Act, providing en-

---

* Jaffe, Louis L., "Judicial Control of Administrative Action," Little, Brown and Company, 1965.

forcement suits may be brought against alleged violators and there is also provision for administrative procedure to determine whether the violations of the Act have transpired, as there is under WHPCA (41 U.S.C. § 39).

In any event we hold that a declaratory judgment should not be granted in the circumstances of this case. There are a number of reasons for this.

■ For one thing the law and administrative practices surrounding the transaction are in a state of development. In ruling that a declaratory judgment was improper when the law was in a state of change, the Court, in Mechling Barge Lines v. United States, 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961) said, at page 331, 82 S.Ct. at page 342:

> "We think that sound discretion withholds the remedy [declaratory relief] when it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted."

■ That case also affirms that the granting or refusal to grant declaratory relief is discretionary. See also, Public Service Commission v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

While in the *Wycoff* case there were no threats to enforce regulations as there are in the instant case, what the Court said is nevertheless pertinent.

■ Paraphrasing, the Court held that the Declaratory Judgment Act of 1934 (28 U.S.C. § 2201) was an enabling act which confers discretion on the Courts rather than an absolute right upon the litigants. Thus, the Courts have discretion to refuse a decree that would not terminate the uncertainty or controversy giving rise to the proceedings. Rule 57 of the Federal Rules of Civil Procedure notes that "a declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case. . . ."

The Court, at 243, 73 S.Ct. at 240, said:

> "The propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power. While the courts should not be reluctant or niggardly in granting this relief in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially in the field of public law. A maximum of caution is necessary in the type of litigation that we have here, where a ruling is sought which would reach beyond the particular case."

In addition it seems to us that granting declaratory relief in this case would be impractical because it would encourage attempts by violators to forestall efforts to enforce the Act by encouraging them to seek federal court intervention for a declaratory judgment that there is no violation. In effect, this would be to assert a defense against a cause of action which may be properly asserted on appeal if the agency's ruling is adverse, and this is obviously undesirable.

We find that there will be the requisite irreparable injury if the injunction does not issue. On the other hand, we find the order will not be inequitable to the defendant.

It is worthy of note that an amendment to the Economic Stabilization Regulation No. 1, found at 40 United States Law Week 2298 (November 23, 1971) recognizes that notice of proposed rulemaking and supplemental public procedure were and are impracticable and contrary to the public interest. Such amendment contemplates cooperation between the government and private citizens, and the government asserts this was lacking in this case. The Transit Company denies this.

It is also worthy of note that 85 Stat. 744 et seq., § 215 (December 22, 1971) provides that no public benefit corporation operating mass transit facilities shall increase any fare without first obtaining the approval of the President or his delegate. This makes it clear that congressional intent regarding price increases by public utilities is that such proposed increases must be reviewed.

We have considered defendant's argument that it increased prices in reliance on § 200.203 and that this section is exclusively applicable in this case. We rejected this because we are of the opinion that the Court must give effect to all rulings and regulations when possible, and to do otherwise would grant selective enforcement. In our view, the plain meaning of § 300.016 requires certification under the facts in this case. That is the view taken by the Justice Department and the Agency, and in the circumstances of this case we think such determination is to be accorded deference.

As noted at the outset, we reserved until final hearing whether or not to roll back the 5¢ fare increase and restore service to the level it was before September 5, 1971. One reason for such reservation is that the necessity for a hearing will be avoided if negotiations are resumed and there is cooperation on both sides as there must be if economic stabilization efforts are to succeed.

Another reason is that as of January 1, 1972, the City and the company agreed on the 50¢ fare for a limited period. In that connection, the Cost of Living Council, acting through the defendant, Office of Preparedness Emergency, issued a ruling September 27, 1971 (according to the defendant, which contends the ruling is invalid; see complaint in Civil Action 1981–71, United States District Court for the District of Columbia) that while a regulated public utility may reduce service to adjust to reduced demand, a reduction to increase return on investment is impermissible.

Thus, a factual question seems to be presented, and it should be decided by the appropriate agency and not be submitted to this Court except on appeal.

To continue the discussion of why the injunction against future increases or service cutbacks is enjoined unless there is a compliance with § 300.016(b), we concluded that the government clearly established its entitlement to such injunction. We decided against ordering a roll back as requested, because since the motion for temporary injunction was filed and a hearing held thereon the City and the Transit Company have agreed on a 50¢ fare. We reserve decision on the request that the Transit Company be ordered to restore service cuts because the Transit Company makes a serious contention that this would be disastrous financially and there appears to be no great need for immediate consideration.

That concludes the discussion, except to say that since our decision to dismiss the request for declaratory relief in Case No. 8249, Congress enacted (December 22, 1971) "Economic Stabilization Act Amendments of 1971," Public Law 92–210 and § 210(a) provides:

"(A) Any person suffering legal wrong because of any act or practice out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, *including an action for declaratory judgment*, writ of injunction (subject to the limitations of section 211), and/or damages." (Emphasis supplied.)

■ We hold to the views expressed herein in the belief that it was not the intent of Congress therein to authorize a declaratory judgment action by a company about to be sued by the United States for violation of the regulations to beat it to the punch by bringing an action for declaratory judgment that it is not in violation thereof or its regulations.