**UNITED STATES of America**

v.

**GREAT ATLANTIC AND PACIFIC TEA COMPANY, Inc., et al.**

**Civ. No. 72-203-B.**

United States District Court,
D. Maryland.
April 19, 1972.

George Beall, U. S. Atty., Leonard M. Linton, Asst. U. S. Atty., D. Md., William E. Nelson and Edward A. Lenz, and L. Patrick Gray, III, Asst. Atty. Gen. Civ. Div., Dept. of Justice, Washington, D. C., on the brief, for plaintiff.

Kenneth F. Hickey and Harry A. Rissetto, Washington, D. C., for defendant Great Atlantic and Pacific Tea Co., Inc.

Peter G. Angelos, Baltimore, Md., and Lester Asher, Chicago, Ill., for defendants Local 117 of the Amalgamated Meat Cutters and Butcher Workmen of North America, Jerry Menapace, Richard B. Long, Irving L. Manger, Jr., and Gene R. Barker.

BLAIR, District Judge.

I.

This case arises out of what is popularly known as Phase II of the President's Economic Stabilization Program which became effective November 14, 1971. The question presented is whether a wage increase in excess of 5.5% negotiated and paid after November 14, 1971 without prior approval of the Pay Board was in violation of the applicable law and regulations.

The United States, in contending that a violation occurred, seeks an injunction against an employer, certain of its employees, and their union. Additionally, the United States asks that civil penalties in the amount of $2,500 be assessed against both the employer and the union.

Defendant, Great Atlantic and Pacific Tea Company, Inc. (A & P), is a Maryland corporation. Defendant, Local 117 of the Amalgamated Meat Cutters and Butcher Workmen of North America (Local 117), an unincorporated association located in Maryland, is the bargaining agent for approximately 77 of its members employed by A & P. Also named as defendants are Jerry Menapace, President of Local 117, and three named employees who served on Local 117's negotiating committee. All of the named individuals together with Local 117 are sued in their own right and as representatives of the class of approximately 77 members of Local 117, comprising the bargaining unit covered by the labor agreement. Rule 17(b), 23 and 23.2 F.R.Civ.P.

This court has jurisdiction by virtue of § 209 of the Economic Stabilization Act as amended, Pub.L. 92–210 (December 22, 1971), and 28 U.S.C. § 1345. By agreement of all parties, the motion by the United States for a preliminary injunction was consolidated for hearing with a trial on the merits pursuant to Rule 65(a), F.R.Civ.P. and trial was held on April 6, 1972.

## II.

The factual setting for this case involves an inter-relationship between the President's evolving program to combat inflation and the resolution of economic differences through a new labor contract by A & P and Local 117.

### A.

Prior to August 15, 1971, the President had relied primarily on fiscal and monetary controls to combat the inflation which had beset the economy of this country. On that date, the President embarked on Phase I of a new economic controls program. In a move receiving wide public notice, the President issued Executive Order 11615, 36 Fed.Reg. 15727, effective August 15, 1971, which "froze" prices, rents, wages, and salaries for a period of ninety days. The Order also established the Cost of Living Council and delegated to it the powers conferred on the President by the Economic Stabilization Act of 1970, Pub.L. 91–379 (August 15, 1970), pursuant to which the Executive Order had been issued.

On October 15, 1971, the President announced Phase II of this new program and issued Executive Order 11627, 36 Fed.Reg. 20139, which established the Pay Board and Price Commission. The Order provided in part:

"The Cost of Living Council will establish broad stabilization goals for the Nation, and the Pay Board and Price Commission, acting through their respective Chairmen, will prescribe specific standards, criteria, and regulations, and make rulings and decisions aimed at carrying out these goals."

On the same date, the Cost of Living Council delegated to the Pay Board authority concerning the stabilization of wages and prices. Order No. 3, 36 Fed. Reg. 20202.

On November 13, 1971, the Pay Board promulgated its first set of regulations, Part 201-Stabilization of Wages and Salaries, 36 Fed.Reg. 21790, effective November 14, 1971. Of importance in this case is a part of § 201.10 of these regulations which reads: "Initially, the general wage and salary standard is established as 5.5%." Subsequently, this Part was amended on December 30, 1971 with the same effective date of November 14. 36 Fed.Reg. 25427. On December 22, 1971, Congress passed the Economic Stabilization Act Amendments of 1971. Pub.L. 92–210.

### B.

At trial, evidence was taken in the form of various stipulations and exhibits as well as testimony from Francis X. Thanner, A & P's local Director of Personnel and Labor Relations, and Jerry Menapace, President of Local 117.

Local 117 is the bargaining agent for 77 A & P employees working in a Baltimore, Maryland meat processing warehouse, performing such duties as receiving, classifying, storing, preserving, selecting, and cutting meats. A & P is a retailer of food and related products to

the general public on a nationwide basis. At the warehouse complex in Maryland which is involved in this case, A & P assembles, processes, and trans-ships meats, groceries, and related products from primary suppliers to approximately 167 stores in the Baltimore, Maryland— Washington, D. C. area.

A & P and Local 117 were parties to a collective bargaining agreement which by its terms expired on September 4, 1971. Negotiations between the company and the union were conducted from September to mid-November 1971 without success in reaching agreement on a new labor contract. On or about November 8, 1971, A & P informed Local 117 that in view of the Pay Board's recent announcement of a wage-price increase standard of 5.5%, effective November 14, 1971, it would not agree to the union's demand for a wage settlement which was in excess of a 5.5% increase. The parties having reached an impasse, the union called a strike on November 13 and set up picket lines at the warehouse. On November 21, 1971, the eight-day strike ended when A & P and Local 117 entered into a new 16-month contract which called for wage increases substantially in excess of 5.5% of the wages paid prior to the new contract. The new contract called for implementation of the wage improvement effective November 22, 1971, "all subject to Pay Board approval." From November 22, 1971 through the date of trial, wages have been paid at the increased rate.

No formal request for approval to the Pay Board was made until an application was filed by Local 117 on January 12, 1972. On March 28, 1972, the Pay Board granted exception status as provided for in § 201.11(a) (1) of the Pay Board regulations, 36 Fed.Reg. 25428 (adopted December 30, 1971, effective November 14, 1971). However, the Pay Board applied a 7% overall limitation as mandated by § 201.11(b) of the same regulations, 36 Fed.Reg. 25429, thus reducing the wage increase that the parties had agreed to and implemented on November 22, 1971.

### III.

The genesis of the present dispute lies in the Economic Stabilization Act of 1970, Pub.L. 91–379, Title II, adopted August 15, 1970. The enactment of this legislation manifested a congressional policy decision that the deleterious economic and social effects of inflation could best be combatted through the Executive Branch and that authority to impose price and wage controls should be added to the President's arsenal. In choosing to delegate to the Executive Branch the determination of the precise manner and means that such authority should be exercised, Congress did not abrogate its role as lawmaker. Congress had ample precedent to do as it did since similar economic control programs had been authorized and implemented during World War II and Korea to contain inflationary forces grossly distorting the national economy.

The earlier programs had withstood attack on broad constitutional grounds and thus far similar attacks on the Economic Stabilization Act of 1970 have proved unsuccessful. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Connally, 337 F.Supp. 737 (D.D.C.1971) (three-judge court), appeal filed January 4, 1972, appeal withdrawn March 22, 1972. In *Amalgamated*, Judge Leventhal, writing for the court, noted a portion of the legislative history from the House report to the effect that "the Act 'reflects a sincere congressional willingness to do its part—and to share the consequences—in a meaningful attack on . . . inflation.' " 337 F.Supp. at 750. The court went on to find that no "blank check" was given to the President, and that under the authority of Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), it was constitutionally permissible for Congress to delegate to the President the authority to impose controls and the duty

> "to take whatever action is required in the interest of broad fairness and avoidance of gross inequity, although presumably his range of discretion

means there may be inequities that a President may remove that he is not compelled by law to remove." 337 F. Supp. at 757.

*See* California Teachers Association v. Newport Mesa Unified School District, 333 F.Supp. 436 (C.D.Cal.1971), dismissed without prejudice, February 28, 1972; United States v. Cincinnati Transit, Inc., 337 F.Supp. 1068 (S.D.Ohio, 1972).

■ Section 211(c) of the Economic Stabilization Act Amendments of 1971, Pub.L. 92–210, provides in part:

"In any action commenced under this title in any district court of the United States in which the court determines that a substantial constitutional issue exists, the court shall certify such issue to the Temporary Emergency Court of Appeals."

No contention has been raised by the defendants that such a substantial constitutional issue exists in this case, nor does it appear to the court that any is involved.[1] Accordingly, the court finds that no certification of issues need be made to the Temporary Emergency Court of Appeals pursuant to its General Rule 25.

The defenses raised are that the laws and regulations as applied in this case to these defendants would for several reasons be unconstitutional and that the defendants are not in violation of the laws and regulations to the extent that such regulations were lawfully adopted.

## IV.

Local 117 and the individual defendants say that to apply the laws and regulations to them as requested by the United States would deprive them of due process and equal protection of law in violation of the Fifth Amendment to

the United States Constitution and that the assessment of the penalty requested would subject them to the ex post facto application of a law in violation of Article 1, Section 9, Clause 3, of the United States Constitution.

The basis for these contentions can be rather simply stated. Local 117 and its members contend that they have a lawful right to work in their chosen field and the imposition of economic controls is an unwarranted interference with that right. The application of a 5.5% wage increase standard to them, they say, would be inequitable and Congress authorized the President to make provision for "such adjustments as may be necessary to prevent gross inequities." § 202(a), Economic Stabilization Act of 1970. The application of the 5.5% wage increase standard effectively limited their bargaining position to an increase of 5.5%, and arbitrarily classified them differently than those similarly situated who had consummated labor contracts prior to November 14, 1971. Unlike the beneficiaries of pre-November 14, 1971 contracts, a post-November 14 contract exposed them to a maximum 7% wage increase limitation by virtue of the adoption of the Pay Board on December 31, 1971 of a regulation to that effect. § 201.11(b), 36 Fed.Reg. 25429. Additionally they say that the laws and regulations as applied to them would be arbitrary and capricious in that the Pay Board held no hearings on and had no basis for establishing either the 5.5% wage standard or the base period to be used in calculating the percentage of increase. Both, they claim, were arbitrarily established to their detriment.

The answers to these contentions may likewise be simply stated. What is at stake is not the right of defendants to work in their chosen field but rather the

---

1. On the date that this opinion was written but prior to its filing, defendants filed a written motion to amend their answer by adding a claim that substantial constitutional questions exist requiring certification to the Temporary Emergency Court of Appeals and by adding a request that this court enjoin the Pay Board Decision of March 28, 1972 pending disposition of the present case. The first contention has been disposed of in this opinion and the court is of the opinion that the second should be denied.

amounts of a wage increase which they could negotiate and receive after November 14. In that respect, they are treated alike with all others. Defendants were not precluded from negotiating a contract after November 14 calling for wage increases in excess of 5.5%. They were precluded from the implementation of such larger increases without obtaining *prior approval* of the Pay Board. Similarly, the inequities about which Congress had manifested concern and which the defendants say are present here can be easily answered. Effective November 14, 1971, Pay Board regulation § 201.11 provided:

> "In reviewing new contracts and pay practices, the Pay Board will consider ongoing collective bargaining and pay practices, and the equitable position of the employees involved, including the impact of recent changes in the cost of living upon the employees' compensation." 36 Fed.Reg. 21791.

Defendants' contention is answered by their own failure to seek Pay Board approval before implementation of the contract provisions.

While it is true perhaps that those who consummated and implemented the provisions of labor contracts prior to November 14 are subject to different regulations than the defendants, who did so after that date, it does not follow that such classification is arbitrary and capricious or deprives the defendants of equal protection of the laws. Clearly, if the new controls were to have the desired effect, they had to be imposed at a point certain in time and without such delay after public notice as to afford those affected an opportunity to escape their impact. True, this may result in hardships, as the union says it did here, but those hardships do not amount to the deprivation of constitutional rights. All that the Constitution requires is that those in each classification be treated alike and there is no showing here that such is not the case. Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Pfeiffer Brewing Co. v. Bowles, 146 F.2d 1006 (Emer.Ct. of App.), cert. denied 324 U.S. 865, 65 S.Ct. 914, 89 L.Ed. 1421 (1945); California Teachers Association v. Newport Mesa Unified School District, *supra*, 333 F.Supp. at 447.

The challenge to the 5.5% standard on the ground that there was no rational basis for the standard and that no hearings were held in advance of its adoption is also unavailing. In adopting, on November 14, 1971, Part 201 of its regulations, the Pay Board announced that ". . . it is hereby found impracticable to issue such regulations with notice and public procedure thereon under 5 U.S.C. § 553(b), or subject to the effective date limitation of 5 U.S.C. § 553(d) [Administrative Procedure Act]." The Pay Board finding obviates the necessity of providing an administrative hearing before the regulations may become effective. Bowles v. Willingham, 321 U.S. 503, 519–521, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *see also* § 207 of the Economic Stabilization Act Amendments of 1971, Pub.L. 92–210. Other than the asserted absence of a hearing in advance of adoption of the regulations, which the court finds was not required, the defendants have produced no evidence to show that the standard adopted was arbitrary and capricious.

The remaining defenses do not rest on constitutional grounds. In essence, they are that the Cost of Living Council did not properly delegate to the Pay Board the power to promulgate regulations under the Economic Stabilization Act and that the 5.5% wage increase standard did not apply to a so-called category III adjustment and, if it did, that the wage adjustment called for in the November 22, 1971 labor contract between the parties was not in excess of a 5.5% increase. The most direct answer to the first contention is that it is erroneous. Section 7(c) of Presidential Executive Order 11627, issued October 15, 1971, provided that the Pay Board shall perform such functions with respect to the stabilization of wages and salaries as the

Cost of Living Council delegates to the Board, 36 Fed.Reg. 20142. Order No. 3 of the Cost of Living Council, issued October 15, 1971, provided in § 1. (a): "There is delegated to the Pay Board (established by § 7 of the Executive order) acting through its Chairman, responsibility for implementing, administering, monitoring, and providing for the enforcement of the stabilization of wages and salaries in conformity with the Executive order." 36 Fed.Reg. 20202.

■ As has been noted above, the adoption of the regulations (here Pay Board regulations §§ 201.10 and 201.11) without advance public hearing was authorized by § 553(b) (3) (B) of the Administrative Procedure Act, Title 5, United States Code. The preamble to the regulations expressly found it impracticable to issue such regulations with prior notice and public procedure under the Administrative Procedure Act. The regulations pertinent to a determination of the issues in this case were lawfully adopted pursuant to a lawful delegation of authority.

Cost of Living Council regulations adopted November 14, 1971 established in Subpart C—"Pay Adjustments—Classifications and Procedures"—three categories based upon the number of employees affected, 36 Fed.Reg. 21788–89. Section 101.21 established category I as a pay adjustment applying to or affecting 5,000 or more employees and required prenotification to the Pay Board and its approval before any pay adjustment could take effect. Section 101.23 established category II as a pay adjustment applying to or affecting from 1,000 to 5,000 employees and required that any pay adjustment to employees in this category be reported to the Board in accordance with its regulations. Section 101.-25 provided for category III pay adjustments, applying to or affecting less than 1,000 employees, and provided that pay adjustments in this category ". . are not subject to prenotification and reporting. However, they are subject to monitoring and spot checks as are pay adjustments by firms in other categor-

ies." From the language of these sections, defendants urge the court to conclude that the wage and salary standard established at 5.5% by § 201.10 of the Pay Board regulations, adopted the same date, does not apply to a category III wage adjustment. With this conclusion, the court cannot agree.

■ Section 101.1 of the Cost of Living Council regulations, November 14, 1971, of which the category pay adjustment provisions are a part, provides, 36 Fed.Reg. 21788:

"The purpose [of these regulations] is also to establish categories of economic units which must comply with the prenotification, reporting, and other procedural requirements prescribed by the Cost of Living Council. In general, such controls, standards and criteria are applicable to all price adjustments and to all pay adjustments, unless otherwise provided, regardless of the category into which any such adjustment falls. However, the procedural requirements vary depending upon the category."

On the same date, the Pay Board adopted regulations which contained in part the following provisions, 36 Fed.Reg. 21791:

"Subpart B—Pay Stabilization. § 201.10 General Wage and Salary Standard.

"On and after November 14, 1971, the general wage and salary standard shall be applicable to new labor agreements and, where no labor agreement is in effect, to existing pay practices. On and after such date, permissible annual aggregate increases will be those normally considered supportable by productivity improvement and cost of living trends. Initially, the general wage and salary standard is estabished as 5.5 percent. The appropriateness of this figure will be reviewed periodically by the Pay Board, taking into account such factors as the long-term productivity trend of 3 percent, cost of living trends, and the objective of reducing inflation."

In an appendix to these regulations, 36 Fed.Reg. 21792, the Pay Board stated its "policies governing pay adjustments adopted by the Pay Board November 8, 1971" included among which are:

"3. The general pay standard should be applicable to: (1) changes that need approval before becoming effective; (2) changes that must be reported when they become effective; and (3) all other changes requiring compliance but not requiring specific approval or reporting.

"4. (a) Effective November 14, 1971, the general pay standard shall be applicable to new labor agreements and, where no labor agreement is in effect, to existing pay practices."

To the court, these provisions make it abundantly clear that while the procedural aspects of the regulations were tailored to the economic impact that wage adjustments in various categories would have on the economy and category III because of its lesser impact was left largely to voluntary compliance, the same wage-price standard applied to all three categories.

The remaining contention to be dealt with is whether the 5.5% wage standard has been violated in this case. The amount of increase was alleged by the United States in this suit to be 22% and was subsequently found by the Pay Board to be 15.5%. Defendants acknowledge, as indeed they must, that the increase is more than 5.5% of the wages paid to the 77 employees of A & P prior to the effective date of the contract, November 22, 1971. The evidence at the trial showed that historically other bargaining units for meat cutters in the Baltimore area have usually entered into labor agreements prior to the renewal of contract negotiations between Local 117 and A & P. These other units have usually achieved wage benefits greater than those being paid to Local 117's A & P employees under their existing contract. The A & P employee members of Local 117 would, at the expiration of their contract, bargain on a "catch-up"

basis to achieve a similar wage gain. Thus, the union's contention goes, the wage base that should be used in determining whether Local 117's members gained more than a 5.5% increase is not the wages actually paid to the 77 employees but is the prevailing wage in the East Coast area or at least the Baltimore area for union members performing comparable work. Even assuming the validity of this argument, there was evidence in contradiction of the claim that Local 117's 77 workers here involved in fact performed comparable work.

In support of its claim, the union cites Pay Board regulations effective November 14, 1971, § 201.11:

"In reviewing new contracts and pay practices, the Pay Board will consider ongoing collective bargaining and pay practices, and the equitable position of the employees involved, including the impact of recent changes in the cost of living upon the employees' compensation." 36 Fed.Reg. 21791.

Section 201.11 was amended on December 30, 1971 with an effective date of November 14, 1971 to make special provision for so-called "tandem relationships" and "catch-up" increases which the union contends are involved here. 36 Fed. Reg. 25428. The amendment provided that the maximum permissible annual aggregate wage and salary increase should not exceed 7% and specifically made such exceptions applicable only if demonstrated to the satisfaction of the Pay Board.

The union's argument is refuted by a reading of both the Executive Order and the Pay Board regulations. Section 1(a) of Presidential Executive Order 11627 reads in pertinent part:

"The Pay Board and Price Commission . . . shall, pursuant to goals of the Cost of Living Council, take such steps as may be necessary, and authorized by or pursuant to this Order, to stabilize prices, rents, wages, and salaries. Pending action under this Order . . . prices, rents, wages, and salaries are stabilized ef-

fective as of August 16, 1971, at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm, or *other entity* of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services." [Emphasis supplied]. 36 Fed.Reg. 20140.

Pay Board regulation § 201.10 in effect on November 14, 1971 provided in part: "On and after November 14, 1971, the general wage and salary standard shall be applicable to *new labor agreements* and, where no labor agreement is in effect, to existing pay practices." [Emphasis supplied]. 36 Fed.Reg. 21791. Clearly the reference to "entity" in the Executive Order and to "new labor agreement" in the Pay Board regulations contemplate a fixed, definable and ascertainable base for comparison. It would be an unwarranted construction to hold that all meat cutters in the East Coast region or indeed in the Baltimore area is the base contemplated by this clear language. Additionally, the Pay Board regulations previously alluded to make it clear beyond doubt that prior application to and consideration by the Pay Board is a prerequisite to the grant of exceptions where such disparities are demonstrated to exist.

For these reasons the court concludes that the laws and the orders and regulations adopted pursuant thereto were constitutionally applied to the defendants; and that the named and unnamed defendants, for which a class is hereby formed, violated said laws, orders, and regulations from November 22, 1971 until at least April 6, 1972 by inducing, paying and receiving, pursuant to the provisions of the labor contract implemented on November 22, 1971, a wage increase in excess of the 5.5% wage standard which became effective November 14, 1971 without prior approval of the Pay Board.

### V.

The United States asks that the defendants be enjoined from such unlawful acts pursuant to the provisions of § 209 of the Economic Stabilization Act as amended, Pub.L. 92–210. To issue such an injunction, there is no need that irreparable injury be shown. "It is enough if the statutory conditions are satisfied." Henderson v. Burd, 133 F.2d 515, 517 (2d Cir. 1943) (Emergency Price Control Act of 1942). At trial, there was filed as an exhibit a decision and order of the Pay Board dated March 28, 1972. After reviewing the contract in question on the application made by Local 117 on January 12, 1972, the Pay Board ruled that an exception be granted under § 201.11(a) (1) to a maximum salary increase of 7%. The court was also informed by A & P that it would voluntarily comply with the ruling of the Pay Board effective with the commencement of the next pay period. These developments do not render the issue moot. As the Supreme Court said in United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953): "The court's power to grant injunctive relief survives discontinuance of the illegal conduct." The Court noted two key factors which are equally apposite to this case:

> "The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion."

345 U.S. at 632, 73 S.Ct. at 897. *Accord,* Gray v. Sanders, 372 U.S. 368, 376, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). A portion of the opinion by Mr. Justice Douglas in a challenge to the Emergency Price Control Act of 1942 is appropriate: "For the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases. That discretion should reflect an acute awareness of the Congressional admonition that 'of all the consequences of war, except human slaughter, inflation is the most destructive'. . . ." Hecht Company v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

■ The acute public interest in the controversy at bar leads this court to conclude that injunctive relief is indicated.

■ The Economic Stabilization Act Amendments of 1971, § 208, Pub.L. 92–210, provide "(b) Whoever violates any order or regulation under this title shall be subject to a civil penalty of not more than $2,500 for each violation." If the violation is willful, the violator is guilty of a crime and subject to a fine of not more than $5,000 for each violation. § 208(a), Pub.L. 92–210. Local 117 and the individual defendants say that since the provision for a civil penalty was added by amendment on December 22, 1971, its application to them would be ex post facto and hence unconstitutional. There are two answers to this contention. The first is that Congress clearly intended to make this penalty civil in nature and the constitutional guarantee against ex post facto application of the law does not apply to civil penalties. *See* Harisiades v. Shaughnessy, 342 U.S. 580, 594–595, 72 S.Ct. 512, 96 L.Ed. 586 (1952). The second is that Local 117, by virtue of the strike in November, its insistence in implementing on November 22 wage increases in excess of 5.5%, and its continuing ability to exert economic sanctions against A & P to enforce payment, has at all times since November 22 been in violation of § 201.10 of the Pay Board regulations. A & P and the named and unnamed individuals by virtue of the payment and receipt, respectively, of wage increases in excess of those permitted by regulation were all in continuous violation of law until at least April 6, 1972 which was considerably after the effective date of enactment of the civil penalty provision.

■ A & P very candidly acknowledged at trial that it considered itself in violation of law from and after the time that it implemented the new pay provisions on November 22, 1971. In its defense, it stated that it was acting in good faith, in that at the time there appeared to be no viable alternative to achieve a settlement of the strike. To this extent, the parties would not seem to be *in pari delicto*. In the court's view, however, a more objective standard should be applied in measuring the culpability of the parties. By that standard, the course of conduct of each party was determined by economic considerations which best served that party's interest. Thus the union and its employees struck to gain the wage improvement and the company agreed to pay the wage improvement to settle the strike. From this point of view, A & P and Local 117 are equally at fault and should be penalized accordingly. Civil penalties are hereby assessed against each in the amount of $2,500.

## VI.

Counsel for the United States will present an order providing for judgments and decreeing injunctive relief in accordance with this opinion.